# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
June 4, 2013 Session

## STATE OF TENNESSEE v. FREDERICK HERRON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 11-04122     Carolyn Wade Blackett, Judge**

---

**No. W2012-01195-CCA-R3-CD  - Filed January 17, 2014**

---

Defendant, Frederick Herron, was indicted by the Shelby County Grand Jury for one count of rape of a child.  Following a jury trial, Defendant was convicted as charged and sentenced by the trial court to serve 25 years at 100%.  Defendant appeals his conviction and asserts that: 1) the trial court abused its discretion by allowing the State to admit into evidence a video recording of the victim's forensic interview; 2) the trial court abused its discretion by ruling that the State could ask Defendant about prior arrests and an unnamed prior felony conviction if Defendant chose to testify; 3) the State failed to ensure a unanimous verdict by electing an offense that occurred on an unspecified date, and the evidence was insufficient to support a conviction for the offense; 4) the trial court should have granted a mistrial after a State's witness testified about Defendant's alleged prior DUI conviction; 5) the trial court abused its discretion by excluding a letter written by the victim to her sister; and 6) the cumulative effect of the trial court's errors deprived Defendant of a fair trial.  Having carefully reviewed the parties' briefs and the record before us, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, J., joined.  JAMES CURWOOD WITT, JR., filed a dissenting opinion.

Neil Umsted, Memphis, Tennessee for the appellant, Frederick Herron.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Terri Fratesi, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Facts

The victim, who will be referred to in this opinion by her initials "M.M.", was seventeen years old at the time of trial. She testified that she was removed from her mother's custody at the age of six. She lived with her sister Takyra, who married Defendant when M.M. was eight or nine years old. She described Defendant as "[n]ice, kind, [and] caring."

M.M. recalled one occasion when she got in trouble with Takyra. She walked upstairs to go to her room. Defendant was in his bedroom, and he asked M.M. to come in there. He sat on the bed and had M.M. stand between his legs with her back facing him. Defendant's pants were down around his ankles, and he was wearing boxer shorts. Defendant touched M.M.'s back, stomach and leg, and he asked her, "[a]re you my baby?" M.M. testified that she heard Takyra coming up the stairs, and Defendant let her go. Takyra asked M.M. what had happened and asked if Defendant's boxer shorts were down, and M.M. told her that they were not. M.M. testified that she thought it was "real weird."

On another occasion, M.M.'s cousin Keyla was visiting at M.M.'s home. M.M. and Keyla were lying in bed awake. She testified that Defendant tried to get in the bed with them, and he was not wearing any clothes. M.M. and Keyla "started kicking" their feet, and Defendant left the room. M.M. told Keyla that it was not the first time that Defendant had come into her room. She did not tell Takyra what happened on that occasion.

M.M. testified that, beginning when she was seven years old, Defendant came into her room "all the time" and had sex with her. She testified that Defendant smelled of beer. She testified that she felt Defendant's penis enter her vagina and that he would sometimes ejaculate on the bed. M.M. testified that on July 4th following her fifth grade year, Defendant came into her room at 2:00 or 3:00 a.m. and moved her legs apart and took off her pants. M.M. asked Defendant why he was on top of her. Defendant stood up, and M.M. picked up a lighter and threatened to burn Defendant with it. Defendant took the lighter from her and told her not to play with lighters. M.M. then left the room. Defendant followed her into the living room, and M.M. threatened to tell Takyra about the sexual abuse. Defendant responded that if M.M. told her sister, it would "mess with [his] marriage." M.M. went back to her bedroom and laid down. Defendant followed her and then licked her leg. M.M. asked Defendant why he did that, and Defendant did not respond. Defendant then left the room. That night, M.M.'s nephew was spending the night. Defendant woke up her nephew to go outside and shoot firecrackers.

M.M. testified that on one occasion, Defendant went into her bedroom and pulled her covers back. He began to take off her pants when Takyra, who was sleeping in another room, woke up and saw Defendant. Defendant ran out of the room. The next morning, Takyra asked M.M. if Defendant had been in her room the night before. M.M. responded that he had, and she told her sister what Defendant had been doing to her. Takyra then told her to sleep with a fork or knife under her pillow. M.M. testified that she believed her sister already "had suspicions" about the abuse because of the questions she had asked. M.M. was angry at her sister for not doing anything to stop the abuse.

Defendant and Takyra separated when M.M. was in fifth grade, and they moved out of the house they shared with Defendant. However, M.M. continued to stay with Defendant on occasion. M.M. testified that on one occasion when she was in eighth grade, she stayed with Defendant. M.M. slept on the floor. When she awoke, she saw Defendant sleeping behind her with his penis out of his boxer shorts. M.M. testified that she once confronted Defendant and told him that he had done hurtful things to her. Defendant stated that he did not remember and asked if he was "drunk" when he "put [him]self in [her]?"

M.M. testified that she attempted suicide when she was in ninth grade. At that time, she was living with her sister Tacoma because Takyra had kicked her out of her home. Before moving in with Tacoma, M.M. lived with Defendant for four months. Defendant visited M.M. while she was at a treatment center after her suicide attempt.

M.M. testified that her niece found M.M.'s diary in which she wrote about being raped by Defendant and then gave the diary to Takyra. In a diary entry on October 4, 2006, when M.M. was twelve years old, M.M. wrote that Defendant had raped her from second to fifth grade. When Takyra confronted M.M. about it in front of other family members, M.M. denied that Defendant had raped her.

M.M. explained that she continued to be around Defendant because "[he] was the only person that was actually taking care of [her]." She testified Takyra was physically and verbally abusive, and Tacoma, her other sister with whom she eventually went to live, had "her own problems." M.M. testified that her fear of being without anyone to take care of her prevented her from disclosing the abuse. M.M. eventually disclosed the sexual abuse to Tacoma, who then took M.M. to talk to a counselor, who in turn reported it to authorities. M.M. was interviewed by Teresa Omry of the Child Advocacy Center in September, 2010. She testified that she did not initially tell Ms. Omry everything that happened because she remembered more afterwards.

M.M. testified that one of the times Defendant had sex with her occurred the day before M.M. menstruated for the first time at the age of nine, in 2003. At the conclusion of

the State's proof, the State elected this offense as the offense for which it was seeking a conviction.

M.M.'s cousin Keyla testified that she stayed the night one night with M.M. when she was visiting family around Christmas of 2003. She testified they were lying in bed talking when Defendant came into the bedroom "butt naked" and sat at the foot of the bed. Defendant lifted the covers and tried to grab M.M.'s legs. Keyla started kicking her feet, and Defendant left the room. Keyla testified that she found M.M.'s diary in 2009 and showed it to Takyra because she was concerned about M.M.

M.M.'s sister Tacoma testified that in 2009, she filed a petition to obtain legal custody of M.M. after she received a phone call from Defendant, in which he stated that M.M. could no longer stay with him. Tacoma testified that she did not even know that M.M. was living with Defendant at that time. After M.M. went to live with Tacoma, Defendant continued to provide financial assistance for M.M. Tacoma testified that Defendant spoiled M.M. by buying her things to the point that "it was getting weird," and Tacoma told Defendant to stop. Tacoma testified that she also found M.M.'s diary and that M.M. told her that Defendant had had sex with her. Tacoma took M.M. to talk to a counselor and filed a police report. She testified that she had suspected abuse was occurring.

M.M.'s sister Takyra testified for the defense. She testified that she obtained custody of M.M. from M.M.'s mother in 2001, when M.M. was six years old. She testified that she and M.M. moved out of the residence they had shared with Defendant in January, 2006. Due to Takyra's work schedule, she continued to take M.M. to Defendant's house on school mornings. M.M. walked to school from Defendant's house and returned to Defendant's house after school. Takyra testified that Defendant was not around M.M. after May, 2006, when M.M. completed her fifth grade school year, and specifically, that Defendant was not around on July 4, 2006. She testified that during the time she and Defendant lived together, she never saw him walking around the house naked and that M.M. never told her that Defendant had touched her inappropriately. Takyra testified that she never suspected that Defendant had done anything inappropriate with M.M., and she denied that she told M.M. to sleep with a fork and knife under her pillow. She testified that M.M. never expressed to her that she was afraid of Defendant. She testified that Defendant's drinking became a problem in their marriage and that "he would drink all the time."

Takyra denied having seen M.M.'s diary. She testified that in May, 2009, Keyla told her what M.M.'s diary said, and Takyra asked M.M. in front of other family members whether Defendant had ever touched her. M.M. responded that he had not and that "she wished people would stop asking her that." Takyra never reported the alleged sexual abuse

to authorities. Takyra testified that M.M. started her menstrual cycle at age nine and that she knew that because M.M. had told her.

In rebuttal, Keyla testified that she saw Takyra read M.M.'s diary, including the entry where M.M. wrote about Defendant raping her.

**Analysis**

*Admission of video recording*

Defendant contends that the trial court abused its discretion by allowing into evidence a video recording of the victim's forensic interview containing a prior consistent statement when M.M.'s credibility had not been impeached. The State concedes that the trial court's admission of the video into evidence was error but argues that the error was harmless.

During the victim's testimony on direct examination, the State introduced into evidence a videotape of the victim's forensic interview with Teresa Omry in 2010. Defense counsel objected to the video recording as a prior consistent statement. The trial court allowed the video into evidence, stating as follows:

> THE COURT: I think you're [defense counsel] going to have the opportunity to cross-examine [the victim] (indiscernible). That's to your advantage because if she says some things that are in direct conflict with what you have, you get to go back to exactly what that is in cross[-]examination. Do you see what I'm saying?
>
> [Defense counsel]: I do, Your Honor[.]
>
> THE COURT: So, I mean, it's like – if you didn't have the opportunity to cross-examine her – to replay the video – go over it again, then I would agree with your objection; but you're going to have an equal amount of time to do exactly the same thing that she's doing. In fact, as far as this court is concerned, probably it will be used to your benefit.

In her video statement, M.M. told Ms. Omry that the abuse began when she was in second grade when Defendant would come into her bedroom at night and have sex with her

while Takyra was sleeping. She stated that she pretended to be asleep. M.M. stated that the abuse stopped when she was in fifth grade, that the last time was on July 4th, and she told about the incident in which she confronted Defendant. She also told about the incident that happened on the night when her cousin Keyla was sleeping over.

The determination of whether evidence is admissible at trial is a matter left to the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *State v. Dellinger*, 79 S.W.3d 458, 485 (Tenn. 2002); *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996).

In the case sub judice, the video was admitted during the direct examination testimony of the victim, the State's first witness; therefore, Defendant had not had an opportunity to impeach the victim's credibility or raise an inference that the victim's testimony was a recent fabrication. "Ordinarily, it is impermissible to corroborate a witness' testimony by evidence of the witness making prior consistent statements, absent an impeaching attack on that testimony." *State v. Meeks*, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993). An impeaching attack includes "insinuations of recent fabrication" or implications of a "deliberate falsehood." *State v. Benton*, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988). "[B]efore prior consistent statements become admissible, the witness' testimony must have been assailed or seriously questioned to the extent that the witness' credibility needs shoring up." *Id*. at 433-34.

Defendant and the State both acknowledge that there were also minor inconsistencies between the video statement and M.M.'s trial testimony, which Defendant asserts, do not qualify as inconsistent statements under Tennessee Rule of Evidence 613(b). Pursuant to Rule of Evidence 803(26), a prior inconsistent statement is admissible under the strictures of Rule 613. Rule 613 states that extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to cross-examine the witness on the statement. As we stated, that did not occur here.

Defendant relies on *State v. Ackerman*, 397 S.W.3d 617 (Tenn. Crim. App. 2012), to support his argument that the trial court's error in admitting the victim's prior consistent statements requires reversal of his conviction. In that case, the young victim was unable to recall instances of abuse and could not recall the forensic interview even after viewing the video. *Id*. at 624. However, the victim testified that statements she made in the video were "the truth." Testimony at trial indicated that the defendant admitted that he masturbated while in a bed he shared with victim; that it was possible the victim had kissed his penis while she hugged him; and that it was possible that his tongue slipped into victim's vagina while they were playing. *Id*. at 627. The defendant testified at trial. On appeal, the defendant argued that the trial court erred by admitting the video as substantive evidence

under 803(26). This court concluded that although the witness could not recall the interview, she did not testify inconsistently with the interview so the interview was not admissible. *Id*. at 638-639. We noted that even if there was an inconsistency, the entire interview would not be admissible. The only portions that would be admissible would be those directly related to the victim's claimed lack of memory. *Id*. at 639. This court concluded that due to the limited nature of the proof against the defendant we could not conclude the error was harmless. *Id*. at 644.

We determine that this case is distinguishable from *Ackerman*, primarily because M.M.'s testimony at trial went beyond her statements in the video interview. The State asserts, and we agree, that unlike the holding in *Ackerman*, Defendant in this case was not prejudiced by the erroneous admission into evidence of the video recording. Even without the video recording in evidence, the victim's testimony at trial was sufficient to establish Defendant's guilt. The State argues that Defendant overstates the corroborative value of the video, which included less detail than the victim's trial testimony, noting that other witnesses, including Tacoma and Keyla, corroborated the victim's testimony. The State also suggests that Defendant used the discrepancies between the video and M.M.'s trial testimony to his advantage. The State argues that where a defendant can use a piece of complained-of evidence to his advantage, it undermines his claim of prejudice. *See State v. Danny Ray Smith*, No. M2009-02275-CCA-R3-CD, 2011 WL 1432033, at *14-15 (Tenn. Crim. App., Apr. 13, 2011), perm. app. denied (Tenn., Aug. 25, 2011).

This court has previously held that a recording of a victim's forensic interview was admissible as a prior consistent statement when the victim's credibility was attacked by the defendant's pursuit of a theme throughout the trial that the victim "had been programmed to recite a litany of allegations against the defendant." *State v. Albert R. Neese*, M2005-0752-CA-3-CD, 2006 WL 3831387, at *5 (Tenn. Crim. App., Dec.15, 2006). Although the State points to parts of defense counsel's closing argument, we find that Defendant's theory in this case was not as overtly an attack on the victim's credibility as in *Neese*, especially at the point in the trial when the video was admitted. Nor are we persuaded by the State's position that Defendant "would almost certainly have been dealing with the properly admitted video at some point" because "it is difficult to imagine that [Defendant], absent admission of this video, would have pursued any other line of defense other than to attack the victim's credibility." We have already concluded that it was error to allow the video statement to be considered as substantive evidence because Defendant had not had an opportunity to attack the victim's credibility.

Nevertheless, we conclude that the error in admitting the prior consistent statement was harmless in this case. Defendant is not entitled to relief on this issue.

*Evidence of Defendant's prior convictions for impeachment*

Defendant contends that the trial court abused its discretion by allowing the State, if Defendant testified, to ask him if he had ever been arrested or convicted of a crime. The State again concedes error but asserts that the error was harmless.

Prior to trial, the State filed a notice of its intent to use Defendant's prior convictions for purposes of impeachment. The notice stated that Defendant had been convicted in Georgia in 1996 for "indecent acts/liberties with a child under the age of 16" and making a false statement under oath. The State acknowledged that the convictions were "more than 10 years prior to the commencement of this proceeding," thus implicating Tennessee Rule of Evidence 609(b). Following a jury-out hearing, the trial court ruled that proof of the convictions was inadmissible under Rule 404(b), finding that it was "highly prejudicial . . . because the crime – or the alleged crime is so similar. . . ." The trial court made clear that if Defendant testified, the State would not be allowed to question him about his indecent acts conviction. Somewhat incredibly, however, the trial court ruled that the State could ask Defendant during cross-examination whether he had been convicted of an unspecified felony, and if he answered untruthfully, the State would be allowed to impeach him with evidence of his conviction for making a false statement under oath. The trial court stated:

> If he [Defendant] opens the door, that's a different thing; because if you **[the State]** ask him – if he chooses to testify, okay – and you ask him, "Have you ever been arrested? – have you ever been involved in any other type of criminal proceeding?" at that point, he does open the door. But what I'm saying right now, in terms of you bringing this up and him not testifying, no, I'm not going to allow it in.
>
> . . . .
>
> It goes to honesty in terms if you ask him the question has he ever been – it does not go to the specifics. Okay. If he says, "Yes" – and I've already ruled that we're not going to discuss that, that's fine. But if you ask the question, and he clearly is not telling the truth on the stand, then I would allow you to impeach him.

During Defendant's case-in-chief, defense counsel objected again to the State asking about Defendant's prior convictions, and the trial court responded,

> THE COURT:     You're opening the door; and if that's what you want to do, that's fine. I was trying to help you.

. . . .

I can't get any narrower than that because of the fact that the convictions – what saves you right now is the convictions are past ten years old. Okay. Also, I ruled already that they are highly prejudicial versus probative because of the fact that they basically are the same convictions that are being alleged at this time.

[Defense counsel]: Okay.

THE COURT: Now, you should have counseled your client about all of that –

[Defense counsel]: I did.

THE COURT: – about the fact that he's really getting – by law, he is not putting himself or placing himself in situations that the state can ask him about those specific crimes. But I don't think if you read that passage that you're referring to [Rule 609] that it says that he cannot be asked about whether he's ever been convicted of a crime at all.

On appeal, the State concedes that the trial court erred by ruling that the State could, if Defendant testified, ask Defendant if he had ever been arrested or convicted.

Tennessee Rule of Evidence 609 allows for the admission of prior convictions for the purpose of impeachment provided that certain conditions are met. However, our supreme court has concluded that "'evidence' of a prior conviction admissible under Rule 609(a) is limited to the fact of a former conviction and the crime that was committed." *State v. Taylor*, 993 S.W.2d 33, 34 (Tenn. 1999). Rule 609 is based on the premise that the trier of fact needs to be informed of prior convictions in order to evaluate a witness's credibility. *Id*. at 35. Identifying the nature of the prior conviction avoids confusion and speculation on the part of the jury and permits the jury to properly evaluate the conviction's probative value on the issue of credibility. *Id*.

Thirteen years prior to the trial in this case, the Tennessee Supreme Court, in *State v. Galmore*, 994 S.W.2d 120 (Tenn. 1999), held that where a trial court allowed the State to make limited reference to a prior conviction as "a felony" without further specific identification as to the type of felony, not identifying the felony permits the jury to speculate

on the nature of the prior conviction.  In *Galmore*, our supreme court clearly set forth the law: "We hold that the trial court erred in ruling that the defendant's credibility could be impeached by asking whether he had been convicted of an unnamed felony." *Id*. at 125. Accordingly, we conclude that the trial court erred by permitting the State to ask Defendant, if he testified, about an unnamed felony conviction.

The State asserts that Defendant has waived review of the issue of past arrests by not including it in his motion for new trial.  Defendant acknowledges that the motion for new trial did not specifically include "arrests," however, Defendant asserts that he repeatedly challenged the introduction of impeachment evidence of prior convictions, "of which impeachment with prior arrests is part in parcel."  The State points out in its brief that "[t]he trial court's ruling on whether the defendant could be asked about arrests is confusing and the trial court finally appeared to say that he could be asked about arrests."  We conclude that to the extent the trial court's ruling allowed impeachment by prior arrests, it is also error.

We must now consider whether the error more probably than not affected the outcome of the trial.  Defendant contends that the trial court's ruling on admissibility of the impeachment evidence effectively precluded him from taking the stand and refuting the allegation of child rape.  Tennessee Rule of Evidence 609(a)(3) provides that "[i]f the court makes a final determination that such proof [of a prior conviction] is admissible for impeachment purposes, the accused need not actually testify at trial to later challenge the propriety of the determination."  Moreover, our supreme court held that a defendant is not required to make an offer of proof or a showing that he would have testified but for the adverse ruling on impeachment evidence in order to preserve the issue for review.  *See Galmore*, 994 S.W.2d at 123.

In *Galmore*, our supreme court noted, however, that its "holding does not preclude a defendant from making a proffer of the substance of his contemplated testimony. Depending upon the facts and circumstances of a case, an offer of proof may be the only way to demonstrate prejudice." *Id*. at 125.  Without an offer of proof, this court cannot know how Defendant's testimony would have changed the complexion of the case with regard to presentation of the defense theory.  In assessing the impact of allowing into evidence improper impeachment on the results of the trial, this court will consider the "theory of the defense," gleaned from "arguments of counsel, the presentation of evidence in the defendant's case-in-chief, and, when appropriate, from the tenor of cross-examination of state witnesses." *State v. Thompson*, 36 S.W.3d 102, 112 (Tenn. Crim. App. 2000).

Defendant asserts that the record clearly demonstrates that his theory of defense was that the allegations were false and that he did not do the alleged acts.  The State acknowledges this defense theory and argues that Defendant "was more than able to present

and argue his theory of the case . . . ." We agree. Through cross-examination, presentation of his case-in-chief, and closing argument, Defendant was able to point to factual discrepancies in the victim's testimony, suggest a motive for the victim having fabricated allegations of sexual abuse, point out a lack of corroboration for parts of the victim's testimony, and impeach the victim with inconsistencies in her trial testimony. Specifically, Defendant presented testimony that Defendant was not present on July 4, 2006, when the victim testified one of the incidents of sexual abuse occurred. Defendant pointed out that at the time M.M. testified that she confronted Defendant and Defendant responded that she might ruin his marriage, Defendant and Takyra were already separated. Defendant pointed out that M.M.'s cousin Keyla was the only witness to corroborate an incident that the victim had testified about. Defendant also brought out that no other family members witnessed an incident, heard M.M. scream, or saw Defendant walk around the house nude. Defendant pointed out that Defendant remained actively involved in M.M.'s life even after family members learned of his alleged sexual abuse of M.M., and Defendant pointed out that M.M. did not cry or otherwise seem upset while testifying at trial or in the video recorded forensic interview. Defendant argued to the jury that he was swept up in "a perfect storm" as a result of being involved with a troubled family who took advantage of his kindness and support of M.M.

This is a close issue. The trial court failed to apply well settled law in making its ruling. The State argues that Defendant's testimony was not "vital to the presentation of his theory of defense." However, having to presuppose what Defendant's testimony would have been in this particular case is what dooms Defendant's ability to show prejudice under the particular facts of this case. We conclude that this case is one of the rare examples referred to in *Galmore*, where "an offer of proof may be the only way to demonstrate prejudice." *Galmore*, 994 S.W.2d at 125. Accordingly, Defendant is not entitled to relief on this issue.

*Election of offense*

Defendant contends that the State made an improper election of offenses by electing an undated act of penetration that the victim testified occurred the night prior to her first menstrual cycle at age nine.

When an indictment charges that a number of sexual offenses occurred over a span of time, the State may introduce evidence of any unlawful sexual activity between the defendant and the victim allegedly occurring during that span of time. *State v. Brown*, 373 S.W.3d 565, 574-75 (Tenn. Crim. App. 2011). However, at the conclusion of its case-in-chief, the State must elect the particular incident for which a conviction is being sought. *Id*. This requirement of election serves several purposes: (1) it enables the defendant to prepare for the specific charge; (2) it protects a defendant against double jeopardy; (3) it

ensures the jurors' deliberation over and their return of a verdict based upon the same offense; (4) it enables the trial judge to review the weight of the evidence in its role as the thirteenth juror; and (5) it enables an appellate court to review the legal sufficiency of the evidence. *Id*.

Recognizing the practical difficulties present in applying the election requirement in cases of child sexual abuse, our supreme court has held that "the state is not required to identify the particular date of the chosen offense . . . . [A] particular offense can often be identified without a date." *Id*. (quoting *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993). The State is not required to prove that an offense was committed on a specific date unless the date is an element of the crime or essential to proving the offense. *State v. Brown*, 992 S.W.2d 389, 392 (Tenn. 1999). As the court explained in *State v. Shelton*,

> If, for example, the evidence indicates various types of abuse, the prosecution may identify a particular type of abuse and elect that offense. Moreover, when recalling an assault, a child may be able to describe unique surroundings or circumstances that help to identify an incident. The child may be able to identify an assault with reference to a meaningful event in his or her life, such as the beginning of school, a birthday, or a relative's visit. Any description that will identify the prosecuted offense for the jury is sufficient. . . . [T]he trial court should bear in mind that the purpose of election is to ensure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask a conviction, then the court cannot be assured of a unanimous decision.

*Shelton*, 851 S.W.2d at 138.

Here, the indictment alleged that Defendant penetrated the victim between July 1, 2002, and July 5, 2006. At the conclusion of the State's case-in-chief, the State elected the incident that the victim testified occurred on the night before the onset of her first menstrual period when she was nine years old. Defendant contends that the "meaningful event [of the victim's first menstrual cycle] could have occurred on any one of the 365 days in the year during which [M.M.] was nine, and she testified to numerous occurrences during [that] year. . . ." Defendant argues that the State's failure to specify a date on which the offense occurred, or a "fixed, static event" such as a birthday or holiday, makes the State's election improper. We are unpersuaded by Defendant's argument. We conclude that the meaningful event, being the victim's first menstrual cycle at the age of nine, is sufficient to identify a particular occurrence. Furthermore, while the date of M.M.'s first menstrual cycle could have occurred on any date during that year, M.M. testified that Defendant penetrated her on the night prior to that event. Although M.M. testified that she was repeatedly raped by

Defendant from second through fifth grade, the State elected the offense M.M. testified occurred the night prior to her first menstrual cycle at age nine. Therefore, the jury could only have considered that offense, not the other incidents about which M.M. testified, even if they occurred during the same year. We conclude that the State's election was sufficient to ensure a unanimous verdict. Defendant is not entitled to relief on this issue.

*Sufficiency of the evidence*

Defendant argues that even if the State's election was sufficient, the evidence was insufficient to support his conviction.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978).

Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." *Id*.; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522. Tennessee Code Annotated defines sexual penetration as any "intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body. . . ." Tenn. Code Ann. § 39-13-501(7).

The victim testified that Defendant penetrated her on the night prior to her first menstrual cycle, at the age of nine. The victim's sister Takyra, with whom the victim lived when she was nine years old, testified that the victim began menstruating at the age of nine. The State contends that this evidence alone, viewed in the light most favorable to the State,

-13-

is sufficient to sustain Defendant's conviction, citing *Letner v. State*, 512 S.W.2d 643, 649 (Tenn. Crim. App. 1974) ("[A]s a general rule a conviction may rest upon the testimony of a single witness. . . ."). However, the State also points to the testimony of the victim's cousin Keyla, who corroborated another incident, as corroborative of "the general factual trustworthiness of the victim's testimony." The State also cites to the entries made by M.M. in her diary.

Defendant argues that the State failed to establish guilt of the elected offense because, Defendant asserts, the victim "did not identify when she actually discharged the blood that she noticed." Defendant points to the lack of "testimony or medical proof regarding the consistency of [the victim's] periods, at what time she reached her first period, or the biological symptoms she typically experienced during menstruation." Defendant contends that the State's election "required" proof establishing when the victim's first menstrual period commenced.

We interpret Defendant's argument as another challenge to the State's election of offense, rather than a challenge to the sufficiency of the evidence. We agree with the State's assessment of the evidence that whatever day M.M. first menstruated, Defendant penetrated her the prior night, according to M.M.'s testimony. M.M. testified about other instances of penetration, but only one act of penetration that occurred the night before she started her menstrual cycle. We conclude that the evidence is sufficient to support Defendant's conviction. Defendant is not entitled to relief on this issue.

*Evidence of DUI classes*

Defendant contends that the trial court erred by failing to declare a mistrial or give a curative instruction to the jury after there was testimony at trial that Defendant was taking DUI classes.

On cross-examination, M.M.'s sister Tacoma testified that Tacoma slashed three of Tacoma's boyfriend's tires when M.M. was living with her, and Defendant drove M.M. to school for a period of time. Tacoma also testified, "[Defendant] was going to his DUI classes or something; and I was driving him." Defense counsel objected, arguing that it was "a non-responsive answer about a criminal conviction." The trial court overruled the objection, stating that defense counsel "opened the door," and the trial court took no remedial action.

The State asserts that because Defendant failed to request a mistrial, he has waived this issue. *See State v. Hall*, 976 S.W.2d 121, 157 (Tenn. 1998) ("The appellants did not request a mistrial be declared based on the prosecutors' comments and thus, waived any

further action by the trial court."). Defendant responds that the issue was not waived because although he did not request a mistrial or a curative instruction, he made a contemporaneous objection, which Defendant argues preserved the issue for our review. Defendant also asserts that defense counsel did not "invite" the witness' response, but rather the line of questioning on cross-examination of Tacoma was intended to show that despite Tacoma's knowledge or suspicion that Defendant had abused M.M., she allowed M.M. to ride to school with Defendant.

The determination of whether to grant a mistrial lies within the sound discretion of the trial court and should be granted "only in the event of a 'manifest necessity' that requires such action." *Hall*, 976 S.W.2d at 147. The burden of establishing a "manifest necessity" lies with the party seeking the mistrial. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *Id*. A trial court's decision regarding whether to grant a mistrial will only be overturned upon a showing of an abuse of discretion. *Id*.

A defendant "will not be permitted to take advantage of errors which he himself committed, or invited, or induced the trial court to commit, or which were the natural consequence of his own neglect or misconduct." *State v. Robinson*, 146 S.W.3d 469, 493 (Tenn. 2004) (quoting *Norris v. Richards*, 193 Tenn. 450, 246 S.W.2d 81, 85 (Tenn. 1952)) (quotation marks omitted). To that end, "[i]f a party fails to request a curative instruction, or if dissatisfied with the instruction given and does not request a more complete instruction, the party effectively waives the issue for appellate purposes." *State v. Griffis*, 964 S.W.2d 577, 599 (Tenn. Crim. App. 1997). Furthermore, failure to request a mistrial waives any further action by the trial court. *Hall*, 976 S.W.2d at 157.

We disagree with the trial court's conclusion that defense counsel "opened the door" to evidence that Defendant attended DUI classes. However, defense counsel failed to make a proper objection to the statement, instead objecting on the grounds that Tacoma's answer was "not responsive" to his question. *See* Tenn. R. Evid. 404(b) (regarding evidence of other crimes, wrongs, or acts); *see also* Tenn. R. App. P. 36 (a party's failure to raise a contemporaneous objection generally waives the issue on appeal). Furthermore, defense counsel failed to request a mistrial or a curative instruction for the jury to disregard the statement. Accordingly, we conclude that any complaint about the trial court's failure to declare a mistrial or give a curative instruction has been waived.

Defendant contends that he is entitled to plain error relief on this issue. In determining whether plain error exists, this court must examine the following factors: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule

of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000). All five factors must be present to establish plain error. *Id*. at 283. The plain error "must have been of such a great magnitude that it probably changed the outcome of the trial." *Id*. (quoting *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994)).

We cannot conclude that plain error exists in this case. Defendant has failed to show that a substantial right was adversely affected or that consideration of any error is necessary to do substantial justice. The brief, equivocal mention by the witness that Defendant *may* have been attending DUI classes at that time was not so damaging as to have required a mistrial had Defendant requested one. We note that the answer was not solicited by the State, and moreover, following the bench conference during which the trial court overruled Defendant's objection, defense counsel continued to elicit testimony about the DUI classes by asking the witness, "So, he was paying you to take him to those classes, right?" Accordingly, we conclude that Defendant is not entitled to relief on this issue.

*Admissibility of victim's letter*

Defendant contends that the trial court erred by excluding from evidence as irrelevant a letter that the victim wrote to her sister Takyra several years after Defendant had stopped sexually abusing the victim. The State argues that the trial court properly excluded the letter.

During trial, Takyra gave a letter to defense counsel that M.M. purportedly wrote to Takyra in 2009. The State objected to the letter being introduced as evidence on the basis that it was irrelevant. Appellant sought to introduce the letter to rebut the State's theory that M.M. was living with Takyra because she had nowhere else to go. The trial court noted that the letter was written three years after the alleged abuse ended, which was time for the victim "to grow up and mature." The trial court noted that the letter did not necessarily reflect the true nature of the relationship between the victim and Takyra. The trial court ruled that the letter had "no relevance, whatsoever, as to that indictment."

The letter states as follows:

> To: Takyra M.      From: [M.M.]
> From the Deepest of My Heart
>
> Ok like here[']s the deal[.] I didn't want to say it out loud because I didn't
> want an interruption. I'm SORRY yes me [M.M] is sorry if I have ever

-16-

showed you disrespect, [a]ttitude, or anything to have shown you that I didn't care. Truthfully I really didn't care. [Y]ou only know as much as you see and to me you just don't get it. Like there is always something I'm [d]oing to me it seems that no matter what I[']m wrong, I[']m going to be wrong, or I[']m finna [sic] be wrong. The things I do most of them I don't do on purpose but it comes across as me doing it intentionally. Like a long time ago I wanted your approval for everything you might not know but I cared what you think and it mattered to me because you're who I looked up to but after a while it seemed as though what I did wasn't good enough for you something was always wrong and could be better and then I felt [and] feel as though no matter what I do[, it] would [not] be enough for you. To me you always assume stuff you always got to be right and you just have to get your point across[.] I mean I understand you getting your point across but can't nobody else get theirs across without you trying to override them or cussing and stuff. To me all that is unnecessary[.] And like when you said that you going to start treating me like your sister well I don't have a problem with that because it[']s like to me you tried to be a mother to me so hard I hated you because you never asked me how I felt about anything you just thought that you automatically knew and I hate when people try to tell me how I feel without asking me first. To me no matter what she did I would still have the same mother but it seemed as though you tried so hard to try and take her place and it just wasn't cool and you bring her up sometimes for the wrong reasons and that hurt every[ ]time you did that. I know you may think that I'm smelling myself as you call it (LOL) but I may be a little but not as much as you are saying I am. Like I hate all the time when you bring up PREGNANCY! I mean come on be dead serious for a moment like I know it probably seems like I'm having sex and doing things I shouldn't but I haven't had nowhere near sexual content with a boy and don't plan on it no time soon. I am a [v]irgin and I'm not afraid to tell nobody and believe me or not [i]t would be nice if you did. And when you talk about my friends I mean I HOPE you don't mean no harm but you can't just judge people you don't know. Destiny my friend ReRe that's my friend CeCe that's my friend Laquinta is not really a friend because I don't just like her like that she cool though but for you to say I'm running the streets or whatever with her datz [sic] dumb but you would know that non[e] of us like her like that if you would have just asked and talked to me[.] I mean you might not like me hate me even but everything you say just don't go in one ear and out the other[.] I just make it seem like it does. So yea, I am going to try to start doing what you tell me to and stuff but you have to at least work with me I hate cleaning what kid doesn't [b]ut I will definitely

give an effort. So don't think that anything I've said I meant offensively[.]
I just had to say it exactly how I felt and no other way or (sugarcoat it) like
ya'll [sic] say[.]

Yours truthfully,
[M.M.]

[Lo]ve you
[Fr]om your
[Da]ughter/Sister

Tennessee Rule of Evidence 402 permits all relevant evidence to be admitted unless otherwise provided by constitution, evidentiary rule, or other Tennessee rule or law. Irrelevant evidence is not admissible. Tenn. R. Evid. 402. Evidence is relevant if it has a tendency to make a fact that is of consequence to the action more or less probable. Tenn. R. Evid. 401. Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403.

We review a trial court's decision to admit evidence as relevant under an abuse of discretion standard. *State v. Turner*, 352 S.W.3d 425, 428 (Tenn. 2011). A decision to admit evidence will be reversed "only when the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning" and the admission of the evidence "caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (quoting *State v. Shirley*, 6 S.W.3d 243, 249 (Tenn. 1999)).

In his brief, Defendant argues that the letter is relevant to rebut the State's theory that the victim remained silent about the abuse because, as the State asserted in its closing argument, Takyra "was not kind and loving to her; and that there was nowhere else to go and no one else to take her in. . . ;" The State argues that there is nothing in the letter that directly contradicts or rebuts the State's theories that the victim did not reveal the abuse sooner because she did not expect help from Takyra or that Takyra knew about the abuse. We agree with the State. The letter does not even mention the abuse. At best, the letter reflects a sometimes turbulent relationship between M.M. and Takyra. The letter actually supports the State's theory that the victim did not reveal the abuse to Takyra sooner because she did not have good lines of communication with Takyra and felt isolated when living with her. In the letter, the victim states, "you tried to be a mother to me so hard I hated you because you never asked me how I felt about anything you just thought that you automatically knew and I hate when people try to tell me how I feel without asking me first."

Defendant also contends that the letter was relevant because the victim states that she was a virgin. However, as the State asserts and the trial court noted, the victim's diary, which was written during the abuse, which disclosed abuse, and which was admitted as evidence, also stated that she was a virgin. The victim explained in her testimony that she did not consider being raped to be a loss of her virginity. References to virginity in the letter were made in the context of Takyra's concerns that M.M. might be pregnant, and the letter suggests that M.M. was not engaging in sexual activity with a boy in 2009.

We conclude that the trial court did not abuse its discretion in excluding the letter. Defendant is not entitled to relief on this issue.

*Cumulative error*

Finally, Defendant contends that the cumulative effect of the errors at trial denied him the right to a fair trial.

The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial. To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings. *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted). However, circumstances which would warrant reversal of a conviction under the cumulative error doctrine "remain rare." *Id*. The reviewing court must consider each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the trial court dealt with the errors as they arose, including the efficacy, or lack of efficacy, of any remedial efforts, and the relative strength of the State's case. *Id*.

Considering these factors in light of the two errors (found to be individually harmless) during the trial, we conclude that Defendant is not entitled to relief on this issue, though it is a very close call. Again, without a proffer of evidence by Defendant of what his testimony would have been in light of the trial court's glaring error of allowing the State to impeach Defendant with an unnamed felony if Defendant testified, we are unable to conclude that there was so much prejudice caused by the multiple errors to cause Defendant not to receive a fair trial. Defendant is not entitled to relief on this issue.

In conclusion, upon consideration of the parties' briefs and the record as a whole, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE