# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 12, 2011 Session

## STATE OF TENNESSEE v. ROBERT CHARLES BROWN

**Direct Appeal from the Circuit Court for Chester County**
**No. 08-CR-41      Donald H. Allen, Judge**

**No. W2009-01159-CCA-R3-CD  - Filed December 6, 2011**

A Chester County Circuit Court jury convicted the appellant, Robert Charles Brown, of eighty-five counts of rape of a child, a Class A felony. After a sentencing hearing, the appellant received an effective one-hundred-year sentence to be served at one hundred percent. On appeal, the appellant contends that the trial court erred by (1) denying his motion to dismiss the indictment because he was deprived of his right to a speedy trial, (2) allowing a State witness to testify about an incriminating hearsay statement made by the appellant, and (3) failing to require the State to make an election of offenses. The State acknowledges that the trial court erred regarding the election of offenses but argues that the error is harmless. We conclude that the trial court committed reversible error by failing to require the State to make an election of offenses. Therefore, the appellant's convictions are reversed, and the case is remanded to the trial court for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Reversed, and the Case is Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

David W. Camp (on appeal) and Kandi Kelley Collins and Paul Myers (at trial), Jackson, Tennessee, for the appellant, Robert Charles Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; James G. Woodall, District Attorney General; and Brian Gilliam, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The record reflects that in June 2008, the Chester County Grand Jury indicted the appellant for eighty-five counts of rape of a child.[1]  All of the counts alleged that the appellant "did intentionally, knowingly, and/or recklessly engage in sexual penetration with [the victim], a child less than thirteen years of age." However, each count alleged a different date for the offense. Specifically, the grand jury returned one count for every month in 1995 through 2001 and one count for the year 2002.[2]

At trial, the then seventeen-year-old victim testified that she was born on April 12, 1991.  The appellant had been her maternal grandmother's boyfriend for the victim's entire life.  The victim's grandmother and the appellant lived together in a trailer, and the victim thought of him as her grandfather.  The victim said that from January 1995 to 2002, she went to her grandmother's house "[p]robably about twice a month" and spent Friday or Saturday night.  The victim would sleep with the appellant in his bed or in her grandmother's bed while her grandmother slept with the appellant.  She said that when she slept with the appellant, he touched her vagina "[s]ometimes with his private, but normally his hands."  The appellant also touched her vagina with his mouth. The State asked whether the appellant touched the inside or outside of her vagina, and she answered, "Both."  She said the appellant always did "[t]he same thing," explaining that he put lotion on his hands and put his fingers inside her vagina.  She said that he also put his mouth "down there" and acknowledged that he used his tongue and lips.  The appellant sexually abused her when she slept with him at night and when she took naps during the day.  She said he abused her "[a]s far back as I can remember."

The victim testified that when she was very young, she thought the abuse was "normal."  However, at some point, she realized something was wrong.  She said that she started telling the appellant to stop but that "he still [did] it."  She said that the appellant "went away" in 2002 and that the abuse stopped.  When the victim was in the fourth or fifth grade, she told her elementary school counselor about the abuse.  However, the counselor did not do anything.  When the victim was thirteen or fourteen years old and in the eighth grade, she and her mother were watching an episode of the Oprah Winfrey show in which the subject was child sexual abuse.  The victim started crying and told her mother about what the appellant had done to her.  She said she had thought about telling her parents earlier but "didn't want the family to come apart."

---

[1]The State originally indicted the appellant for only one count of rape of a child.  According to the appellant, "[O]n the day of trial, after a favorable defense ruling by the [trial court], the state made the decision to Nolle Prosequi the case, and to re-indict Brown on multiple counts."

[2]We note that the counts for November 1996, May 1998, and March 2000 are missing from the record on appeal.

The victim testified that she had seen four or five counselors since she revealed the abuse to her mother and that she told the counselors about the abuse. The victim said that after the appellant moved out of her grandmother's trailer, he wrote "[c]ountless" letters to her in which he asked her to forgive him and quoted Bible scripture. She said that the appellant was still her grandmother's boyfriend.

On cross-examination, the victim testified that her grandmother's trailer had five or six rooms and that the appellant's bedroom did not have a door. Sometimes during the abuse, the appellant would hear the victim's grandmother walking toward his bedroom and would stop abusing the victim. The victim said that she kept the appellant's letters for a while but that her mother threw them away. She described her home life as "hard" and said her parents used to argue frequently. The victim acknowledged that she received counseling in elementary school due to her parents' fighting, not the sexual abuse. Although she revealed the abuse to her elementary school counselor, the counselor did not contact her parents or the police. The victim acknowledged that she received treatment at Pathways and told someone at the facility about the abuse. However, the person did not contact the police. Instead, the victim was diagnosed as bipolar and was prescribed Paxil. The victim also received treatment at Le Bonheur Children's Hospital and Lakeside. The victim said that at the time of trial, she took many medications, had anger problems, and still attended therapy sessions once per month.

The victim's mother testified that she had known the appellant since she was sixteen or seventeen years old and that he was her mother's boyfriend. At the time of trial, he had lived with her mother for twenty years. The victim began spending the night with the victim's grandmother and the appellant when the victim was about six months old. The victim's mother said that the victim "would go . . . maybe once or twice a month and stay maybe half of the weekend." Sometime when the victim was twelve to fourteen years old, the victim and her mother were watching the Dr. Phil show on television. The victim's mother said that the victim "came in and [sat] down and listened to the show and informed me that something had happened." The victim's mother said that the victim was upset and crying and that the victim said the appellant "had messed with her, had touched her inappropriately." The victim's mother said she was "floored" by the victim's allegations. The victim's mother had never noticed any physical or emotional signs of abuse. However, when the victim was about three years old, she played with dolls inappropriately by putting one doll's head between another doll's legs. After the victim revealed the abuse, the victim's school counselors recommended that the victim receive treatment at Pathways. The victim also received treatment at Le Bonheur Children's Hospital for anxiety and at Lakeside for an overdose when she was sixteen.

The victim's mother testified that she received six or seven letters from the appellant

after the victim revealed the abuse. She said that in the letters, the appellant "would write and ask how everybody was doing, he would ask how [the victim] was doing . . . . The rest of it would pretty much be scripture." The appellant did not mention the abuse in the letters. The victim's mother said she threw the letters away because she was disgusted with the appellant and "didn't want any part of him in my house." The appellant also wrote letters to the victim. The victim's mother read some of the letters, which asked the victim not to tell anyone about what he had done and asked for the victim to forgive him. The victim's mother told the appellant to reveal the abuse to the victim's grandmother.

On cross-examination, the victim's mother testified that Lakeside was the last facility where the victim received treatment. Someone at Lakeside finally reported the victim's allegations to the police. The victim's mother did not contact the police about the victim's allegations because the victim had a lot of health problems. When the victim was a baby, the victim's mother noticed some redness and irritation on the victim's private area when the victim returned from visiting her grandmother and the appellant. The victim's mother said, "I didn't know who was doing it. I know when I told my mother that the redness stopped."

Rodney Sampley testified that he was a Correctional Officer for the Chester County Sheriff's Department. In 2002, Sampley was doing a routine walk-through of the jail, where the appellant was being held. Sampley said that the appellant was standing at the door to his cell and that Sampley "stopped to just make conversation" with him. Sampley stated that the appellant said, "Rodney, do you honestly believe that there is anything wrong with raping a child?" Sampley said he did not answer the appellant but "turned and walked away because I couldn't do anything else." He said that the appellant was serious, not joking, and that the appellant's statement made him very angry.

The jury convicted the appellant of eighty-five counts of rape of a child, a Class A felony. After a sentencing hearing, the trial court sentenced the appellant to twenty years for each count. The trial court ordered that counts one through thirteen, which included the one count for 2002 and the twelve counts for 2001, be served concurrently; that counts fourteen through twenty-five, which included the twelve counts for 2000, be served concurrently; that counts twenty-six though thirty-seven, which included the twelve counts for 1999, be served concurrently; and that counts thirty-eight through forty-nine, which included the thirty-six counts for 1995, 1996, and 1997, be served concurrently. However, the five effective twenty-year sentences were to be served consecutively, for a total effective sentence of one hundred years in confinement.

## II. Analysis

### A. Speedy Trial

The appellant contends that the trial court erred by denying his motion to dismiss the indictment because he was deprived of his right to a speedy trial. The State contends that this issue has been waived because the appellant failed to include the transcript from the motion hearing in the appellate record. We agree with the State.

Before trial, the appellant filed a motion to dismiss the eighty-five-count indictment, arguing that the State had violated his right to a speedy trial. According to the trial court's brief written order denying the motion, the trial court held a hearing on the motion on August 26, 2008. However, the appellant has failed to include the transcript from the hearing in the appellate record.

The appellant argues in his reply brief that this court does not need the transcript in order to consider the issue. However, as this court has repeatedly stated, it is the appellant's duty to prepare a record which conveys a fair, accurate, and complete account of what transpired in the trial court which forms the basis of his appeal. See Tenn. R. App. P. 24(b). "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Without a transcript of the hearing, which would have included the parties' arguments, the evidence presented, and the trial court's oral findings, we cannot consider the merits of the issue.

## B. Rodney Sampley's Testimony

Next, the appellant contends that the trial court erred by allowing Rodney Sampley to testify about the appellant's incriminating jailhouse statement because it was a question, not a "statement" for the purposes of hearsay. Citing State v. Flood, 219 S.W.3d 307 (Tenn. 2007), he claims that he merely asked Sampley "a general question" and that the question "was not an assertion of anything specific." The appellant also argues that if the statement was hearsay, then it was not admissible under the party admission exception to the hearsay rule because it was not an admission of culpability or criminal activity. Finally, the appellant argues that the statement was irrelevant and highly prejudicial. The State argues that the appellant's statement was hearsay and admissible under the party admission exception to the hearsay rule. We agree with the State.

The appellant filed a pretrial motion, claiming that Sampley's testimony about the appellant's incriminating jailhouse statement was inadmissible pursuant to Tennessee Rule of Evidence 403 because it was highly prejudicial and Rule 404 because it was character evidence. At a hearing on the motion, Sampley testified that in 2002, he was working as a jailer in the Chester County Jail. Sampley walked down the hall of the jail and encountered the appellant, who was standing at the door to his cell. Sampley said that he stopped at the

door and that the appellant said, "Rodney, do you honestly believe that there is anything wrong with raping a child?" Sampley said he did not respond to the appellant, walked to the front of the jail, and went outside because "I was so angry[,] had I not walked outside, I don't know what would have happened." Sampley said he had not said anything to the appellant prior to the appellant's statement. On cross-examination, Sampley acknowledged that the appellant asked a question. However, he explained, "I wouldn't say he wanted a response. I'd say he made a statement."

At the conclusion of the testimony, defense counsel argued that the statement was inadmissible hearsay pursuant to Tennessee Rule of Evidence 802 and did not fall under Rule 803(1.2), the exception to the hearsay rule for party admissions. Counsel argued, "He didn't admit to doing anything. He simply asked the jailor a question. An admission by definition is a statement by a party to an action inconsistent with his claim or position in this action and amounting therefore to proof against him." Counsel also argued that the statement was inadmissible pursuant to Tennessee Rule of Evidence 404(a) because the statement was relevant only to show that "this was his mind set and this was his idea or theory on life and he conformed his actions therewith. . . . If the State can come up with another reason . . . we would look to 404(b) to see if it passes that test." The State claimed that the appellant's hearsay statement was an admission, arguing, "It takes the form of a question, but any reasonable person knows that just because something takes the form of a question doesn't mean you are not making a statement. . . . He is saying, 'I don't believe there is anything wrong with raping a child.'" The State also argued that the statement was very probative of the appellant's intent and that the prejudicial effect of the statement did not outweigh its probative value.

The trial court ruled that Tennessee Rule of Evidence 404(b) was inapplicable because the statement did not involve a prior bad act. The trial court also ruled that the statement was admissible hearsay, stating,

> "Do you honestly believe that there is anything wrong with raping a child?" You know, that could be phrased in terms of a question, but at the same time it's also at least a statement that he honestly believes there's nothing wrong with raping a child. You know, certainly that would be a statement against his interest.
>
> Now, obviously it may be prejudicial, but just because it's prejudicial doesn't mean it should be excluded. . . . It does go to show his state of mind at that time concerning, I guess, his thoughts about raping a child and the Court will allow that

statement to be entered into evidence.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A "statement" is an oral or written assertion. Tenn. R. Evid. 801(a). In order to be an assertion, an utterance must "be offered with the intent to state that some factual proposition is true." State v. Land, 34 S.W.3d 516, 526 (Tenn. Crim. App. 2000). "On rare occasions a question may be hearsay because it is used to prove an implicit assertion." Neil P. Cohen et al., Tennessee Law of Evidence, § 8.01[10] (5th ed. 2005).

Generally, hearsay is inadmissible unless the statement falls under one of the exceptions to the hearsay rule. See Tenn. R. Evid. 802. Tennessee Rule of Evidence 803(1.2)(A) provides that the hearsay rule does not exclude a party's own statement which is offered against that party. "This means that any assertion a party spoke, wrote, or did may be used against that party as an admission." Cohen, Tennessee Law of Evidence, § 8.06[3][a] (footnotes omitted).

> Contrary to some common misconceptions, it does not matter that the statement was self-serving when made but turns out to be harmful by the time of trial. Accordingly, the misleading term, "admission against interest," should be banned from courtrooms and appellate opinions. Under Rule 803(1.2)(A), it does not matter whether the declaration was self-serving when made. Moreover, the admission need not be inculpatory, against interest, or even contrary to the trial position of the party who made it. If the opponent wants to use it, the statement comes in as evidence.

Id. (footnotes omitted); see also State v. Lewis, 235 S.W.3d 136, 145 (Tenn. 2007). "The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court." State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001).

In Flood, 219 S.W.3d. at 310, the defendant was accused of raping his eight-year-old cousin. After the victim's father learned about the sexual abuse, the victim asked him if the defendant "would still have to go jail if someone else were caught." Id. at 313. Our supreme court ruled that the victim's question was admissible as nonhearsay, stating,

> it is unclear from the question whether it was intended as any
> type of assertion. The victim could have intended the question

as an assertion that someone else committed the sexual abuse. She also could have intended the question as an assertion of her concern for her cousin, or she could have intended it to be just an innocent question, not intended to assert anything. Because nothing in the record suggests that the victim intended an assertion by her question, we conclude that the victim's question was not a "statement" for the purposes of hearsay.

Id. at 314-15.

Turning to the instant case, Sampley, who heard the tone of the appellant's voice and the inflection in his voice, testified that he understood the appellant to be making a statement, not asking a question. The trial court, obviously accrediting Sampley's testimony, ruled that the appellant's utterance was "a statement that he honestly believes there's nothing wrong with raping a child." Unlike Flood, evidence exists in the record to support the trial court's ruling that the appellant made an assertion. The statement also was offered for the truth of the matter asserted, i.e., that the appellant thought there was nothing wrong with raping a child. Given that the appellant was a party opponent, his statement was admissible pursuant to Rule 803(1.2)(A), Tennessee Rules of Evidence.

The appellant also argues that the statement was irrelevant and highly prejudicial. To be admissible, evidence must be relevant to some issue at trial. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. It is within the trial court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. See State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). "Under this standard, we will not reverse unless the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Cannon, 254 S.W.3d 287, 295 (Tenn. 2008) (internal quotations and citations omitted).

The appellant's statement was highly relevant to show that he acted intentionally, knowingly, or recklessly as charged in the indictment. Although the appellant's statement also was highly prejudicial, in light of the probative value of the statement, we cannot say that its probative value was substantially outweighed by its prejudicial effect. Therefore, the

trial court did not abuse its discretion by ruling that Sampley's testimony was admissible.

## C. Election of Offenses

The appellant asserts that the trial court should have required the State to make an election of offenses as required by our supreme court in several opinions over a long period of time. See State v. Johnson, 53 S.W.3d 628 630 (Tenn. 2001); Tidwell v. State, 922 S.W.2d 497 (Tenn. 1996); State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993); State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1991); Burlison v. State, 501 S.W.2d 801, 803 (Tenn. 1973). The State acknowledges that the trial court should have required the prosecution to make an election of offenses but argues that the error was harmless because the victim "recounted a single set of facts constituting the crime and testified that the same facts happened every time she visited the [appellant]." However, the State also acknowledges that this argument was squarely rejected by our supreme court in Tidwell. We are required to strictly follow the law as set forth by our supreme court and, thus, cannot rule contrary to precedent established by that court even if we feel that a ruling should be revisited. See Barger v. Brock, 535 S.W.2d 337, 341 (Tenn. 1976).

At the conclusion of the witnesses' testimony, defense counsel made the following argument:

> Your Honor, it's my understanding that our client is charged with 85 counts. From the proof put on by the State, first of all, we didn't hear 85 counts. Second of all, we only heard about generics. We didn't hear about specific instances. Third of all, they are alleging one count per month where the girl is alleging she went over several times per month. Based on those facts alone, I believe it is impossible for the jury to reach an unanimous decision as to any one count.

The State responded that the victim testified about "several instances of times where the defendant penetrated her digitally and orally with his own mouth on her private parts" and that the victim testified the incidents happened at least once per month from January 1995 to 2002. The State argued that it would have been impossible for the victim, who was only three years old when the abuse started, to have testified about specific dates.

The appellant's argument regarding the jury's inability to reach a unanimous verdict was a request for an election of offenses. Instead of addressing it as such, the trial court summarized the evidence presented and concluded that "the proof is sufficient at this point to allow all 85 counts to be submitted to the jury." The trial court instructed the jury during

the charge, "Please keep in mind that each count alleges a separate criminal offense of rape of a child committed during the particular month and particular years stated on each count of the indictment."

When an indictment charges that a number of sexual offenses occurred over a span of time, the State may introduce evidence of any unlawful sexual activity between the defendant and the victim allegedly occurring during that span of time. State v. Rickman, 876 S.W.2d 824, 828-829 (Tenn. 1994). However, at the conclusion of its case-in-chief, the State must elect the particular incident for which a conviction is being sought. See Burlison, 501 S.W.2d at 803; see also Johnson, 53 S.W.3d at 630. This requirement of election serves several purposes: (1) it enables the defendant to prepare for the specific charge; (2) it protects a defendant against double jeopardy; (3) it ensures the jurors' deliberation over and their return of a verdict based upon the same offense; (4) it enables the trial judge to review the weight of the evidence in its role as the thirteenth juror; and (5) it enables an appellate court to review the legal sufficiency of the evidence. Brown, 992 S.W.2d at 391.

Recognizing the practical difficulties present in applying the election requirement in cases of child sexual abuse, our supreme court has granted that "the state is not required to identify the particular date of the chosen offense. . . . [A] particular offense can often be identified without a date." Shelton, 851 S.W.2d at 137; see Brown, 992 S.W.2d at 392 (providing that "[t]he State is not required to prove that an offense was committed on a specific date unless the date is an element of the crime or essential to proving the offense."). As the court explained,

> If, for example, the evidence indicates various types of abuse, the prosecution may identify a particular type of abuse and elect that offense. Moreover, when recalling an assault, a child may be able to describe unique surroundings or circumstances that help to identify an incident. The child may be able to identify an assault with reference to a meaningful event in his or her life, such as the beginning of school, a birthday, or a relative's visit. Any description that will identify the prosecuted offense for the jury is sufficient. . . . [T]he trial court should bear in mind that the purpose of election is to ensure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask a conviction, then the court cannot be assured of a unanimous decision.

Shelton, 851 S.W.2d at 138.

-10-

However, in Tidwell, 922 S.W.2d at 501, the State argued that, when a victim is unable to recount any specifics about multiple incidents of abuse except that the defendant engaged her in sexual intercourse on numerous occasions, "'jury unanimity is attained . . . because, although the jury may not be able to distinguish between the various acts, it is certainly capable of unanimously agreeing that they took place in the number and manner described.'" (Emphasis added.) The Tennessee Supreme Court specifically rejected this argument. Id. Moreover, the court held, "A defendant's right to a unanimous verdict before imposition of conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of assembling a 'patchwork verdict' based on the different offenses in evidence." Id.

In the instant case, the victim testified that from January 1995, when she was three years old, until sometime in 2002, when she was ten or eleven years old, the appellant penetrated her vagina with fingers, and sometimes his mouth, every time she visited him and her grandmother. She also testified that she visited them at least one weekend per month. However, the victim could not provide a single detail that differentiated one offense from another.

The facts in this case are similar to the facts in Tidwell. In that case, the defendant was indicted for fourteen counts each of rape, statutory rape, incest, and contributing to the delinquency of a minor for engaging in sexual activity with his thirteen-year-old daughter once per month for fourteen months. 922 S.W.2d at 499 n.2. At trial, the victim testified that the sexual activity actually occurred about once per week during that time period. Id. For all but two of the rapes, she was unable to "ascribe a particular act to a specific time, whether by date or other reference." Id. The jury convicted the appellant of forty-two counts: fourteen counts each of rape, incest, and contributing to the delinquency of a minor. Id. at 498-99. In explaining why the State should have made an election of offenses, our supreme court stated,

> The State apparently concludes that "jury unanimity is attained in such cases because, although the jury may not be able to distinguish between the various acts, it is certainly capable of unanimously agreeing that they took place in the number and manner described."
>
> This approach, in our view, is akin to a "grab-bag" theory of justice. To illustrate the operation of this theory, in any given case the State could present proof on as many offenses within the alleged period as it chose. Because all such offenses will have been "proven," the jury may, in effect, reach into the

brimming bag of offenses and pull out one for each count. Even when done by this method, the argument goes, each offense will have been proven beyond a reasonable doubt. We acknowledge that the illustration is an extreme one, but we think it makes the point: such an approach is contrary to our law.

Id. at 501.

The State argues that the current case is distinguishable from Tidwell in that the appellant was charged with only one crime, rape of a child, as opposed to multiple crimes. However, the supreme court in Tidwell did not base its ruling on the fact that multiple types of crimes were alleged.

The State also asserts that to require an election of offenses in this type of case "prevents the State from prosecuting defendants who have been successful in delaying disclosure of their crimes." However, our supreme court has also rejected this argument, stating,

> the rules of evidence and the rules of procedure have been relaxed to some extent to accommodate very young witnesses. Nevertheless, the constitutional protections guaranteed a criminal defendant, who is presumed by law to be innocent until proven guilty, cannot be suspended altogether because of the victim's age or relative inability to testify. In cases such as this one, the state must either limit the testimony of prosecuting witnesses to a single event, or prepare the case so that an election can be made before the matter is submitted to the jury to decide.

Shelton, 851 S.W.2d at 139. In light of the foregoing, we conclude that the trial court committed reversible error by failing to require the State to make an election of offenses.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, the appellant's convictions are reversed. The case is remanded to the trial court for a new trial.

_____
NORMA McGEE OGLE, JUDGE