IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs at Knoxville June 24, 2014

## STATE OF TENNESSEE v. JIMMY DALE QUALLS

**Appeal from the Circuit Court for Hardeman County**
**No. 2010-CR-88    J. Weber McGraw, Judge**

---

**No. W2013-01440-CCA-R3-CD  - Filed August 18, 2014**

---

The Defendant, Jimmy Dale Qualls, was convicted by a Hardeman County Circuit Court jury of thirty-seven counts of sexual battery by an authority figure, Class C felonies. *See* T.C.A. § 39-13-527 (2010). The trial court sentenced the Defendant as a Range I, standard offender to five years for each conviction and ordered partial consecutive sentences. The thirty-seven counts were separated into seven groups for sentencing purposes. Group A contained Counts 1 through 6, Group B contained Counts 7 and 8, Group C contained Counts 9 through 14, Group D contained Counts 15 though 20, Group E contained Counts 21 through 26, Group F contained Counts 27 through 32, and Group G contained Counts 33 to 37. The court ordered each group to run consecutively to each other, for an effective thirty-five-year sentence. The court further ordered the effective thirty-five-year sentence. On appeal, he contends that the State failed to make a proper election of the offenses and that the evidence is insufficient to support his convictions. We conclude that the State failed to make an adequate election of the offenses, and we reverse the judgments of the trial court and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed; Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Andrea Sipes Lester (on appeal), Jackson, Tennessee and David A. Stowers (at trial), Bolivar, Tennessee, for the appellant, Jimmy Dale Qualls.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Mike Dunavant, District Attorney General; and Joe Van Dyke and Katie Walsh, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

At the first trial in 2010, the Defendant was convicted of thirty-seven counts of sexual battery by an authority figure and one count of incest. The trial court sentenced him to an effective thirty-two-year sentence. The Defendant appealed his convictions, and this court affirmed the incest conviction but reversed the sexual battery by an authority figure convictions because the trial court failed to require the State to make an election of the offenses. *See State v. Jimmy Dale Qualls*, No. W2010-02523-CCA-R3-CD (Tenn. Crim. App. Mar. 14, 2012). At the retrial, the Defendant was convicted of thirty-seven counts of sexual battery by an authority figure of his two daughters and is the subject of this appeal.

At the trial, the victims' mother testified that she and the Defendant divorced three years previously after twenty years of marriage. She said that they had four children, including E.K.Q. born on September 1, 1989, and E.Q. born on November 30, 1993. They lived in a four-bedroom house. She said the Defendant's inappropriate conduct involved his asking E.K.Q. and E.Q., "May I pinch your p----." She said she saw the Defendant insert his "finger in the crack of their butt . . . and wiggle it around[.]" She said the Defendant was in the bathroom when the victims got out of the shower, touched their "chests" when the victims obtained new undergarments, and looked at their underwear and made "sure they . . . fit right." She said the Defendant ensured the victims' bras fit correctly by feeling the victims' breasts. She said the victims laughed it off when the Defendant touched their buttocks because "you just don't say no" to the Defendant. She said that if they looked at the Defendant the wrong way, he got in their faces, yelled, and hit them. She said the Defendant was the boss in the household, and the victims were scared to report his conduct.

Regarding E.Q., the victims' mother testified that the incidents occurred between January 2007 and May 2009, and that during that time, she saw the Defendant's sexual behavior. When asked why she did not stop the Defendant from touching the victims, she said she tried sometimes. She said the Defendant told her, "Don't get between me and my kids, b----." She said that the Defendant beat her when she attempted to intervene and that his treatment of the victims became worse because she "interrupted the process."

Regarding E.K.Q., the victims' mother testified that E.K.Q. was older than E.Q. and that E.K.Q. left home when she turned eighteen. She said that E.K.Q. told her and the Defendant during a Bible study lesson in their house she had sexual relations previously and that the Defendant told the victim she would have to leave the house if she had sexual relations again because she was not going to display that type of "slutty behavior" in front of her younger sisters.

The victims' mother testified that she was sexually abused by her father as a child and that the "lifestyle" was the only one she had known. She said her suffering abuse made it difficult for her to stop what was happening to her daughters.

The victims' mother testified that the victims had little freedom, that the victims were not allowed to date, and that she attended the victims' school activities. She denied that the victims fabricated stories about the Defendant's touching them. She said the victims wanted out of the house because of the Defendant's touching them. She said the Defendant's asking, "May I pinch your p----," happened all the time. She said E.Q. left the house in May 2009 after the Defendant was arrested for the present offenses. She said her two other children were removed from her care and placed with her sister in Arkansas. She said E.Q. also went to her sister's house and that E.K.Q. went to her sister's house when she left home after turning eighteen.

On cross-examination, the victims' mother testified that she and the victims discussed testifying in court because they each received subpoenas but that they did not discuss the substance of their testimony. She said she witnessed the Defendant's touching the victims after they received new bras. She did not recall if she mentioned the incidents regarding the bras to the police in her previous statements but said she was not surprised if she failed to mention it. She said the home Bible study classes were almost daily. She agreed that the victims had "straight A's" in school and that her sister was less strict than the Defendant. On redirect examination, she stated that her sister did not inappropriately touch the victims, which was another reason the victims might have wanted to live with her sister.

E.K.Q. testified that she was born on September 1, 1989, and that the Defendant was her father. She said she left home after she graduated from high school. She said she lived with her parents and siblings from January 2007 to August 2008. She denied having a good relationship with the Defendant and said he asked to pinch her "p----" frequently. She said the Defendant grabbed her buttocks a lot when she and her sister tried on new bras and panties. She said the Defendant also came up behind her and her sister and used his finger to "fiddle" with their "butt cracks." She said that the Defendant laughed when he touched them and that he said it was okay for him to touch them but not okay for others to touch them. She denied needing him to show her what others were not allowed to do.

E.K.Q. testified that she followed the Defendant's instructions and that there were consequences for disobedience. She said the Defendant kept a "whooping stick" on the gun rack and had choked, punched, and "stomped" her previously.

E.K.Q. testified that she saw the Defendant touch her sister E.Q. and ask E.Q. if he could "touch her p----." She said the Defendant acted as though he was attempting to grab

their vaginas. She said the Defendant grabbed her vagina when making the statement but "usually made a big joke out of it." She said the Defendant's touching her happened frequently. She said the touching started in January 2007 when she was a senior in high school. She said that when she and E.Q. took showers, the Defendant used the bathroom. She said that the Defendant remained in the bathroom when she attempted to dry off but that if the Defendant noticed her attempting to stay covered, he would "bust us out" and say, "Why are you trying to keep yourself covered? I'm your dad. It's not like I'm going to look at you or anything?" She said her mother was nearby when this happened. She said the last time her mother tried to stop the Defendant, he choked, kicked, and slapped her mother. She said the only person the Defendant was not abusive toward was her youngest sister K.Q.

E.K.Q. testified that the most frequent abuse she suffered from the Defendant was his grabbing her buttocks and fondling and pinching her vaginal area over her clothes. She denied the Defendant touched her beneath her clothes. Regarding the fondling, she said, "[I]t all kind of was altogether" and agreed it was "done in concert with each other." She said the Defendant asked to "pinch" her "p----" and fondled her buttocks and vaginal area between January 1, 2007 and January 30, 2007. She said the Defendant engaged in the same conduct between February 1, 2007 and February 27, 2007, between March 1, 2007 and March 30, 2007, between April 1, 2007 and April 29, 2007, between May 1, 2007 and May 30, 2007, between June 1, 2007 and June 29, 2007, between July 1, 2007 and July 30, 2007, and between August 1, 2007 and August 31, 2007. She said the Defendant's fondling her buttocks and vagina occurred inside their home and in the presence of her family members.

E.K.Q. testified that she left home in May 2009, moved in with her aunt, who lived in Arkansas. She said her aunt helped her leave the family home and report the Defendant's touching her to the police. She said she reported to the police three days after she moved from the home. She said she left because she did not feel safe or comfortable as a result of the Defendant's touching her buttocks and vaginal area and beating her. She denied she wanted to leave the home because the Defendant was strict. She said that it was an uncomfortable environment, that she was depressed constantly, and that life was difficult because of the things the Defendant did in the house.

On cross-examination, E.K.Q. testified that she never sought medical attention. She denied that the Defendant's strict environment was the problem and said the problem was how the Defendant treated her. She said that the Defendant touched her vaginal area many times but not necessarily when he asked to pinch her "p----." She agreed she had talked to her aunt about the Defendant. She denied that the Defendant kicked her out of the house because she had premarital sex and said that the Defendant told her two weeks before she left that she would have to leave if she had premarital sex again. She said she had premarital sex

two days before she left. She said she was scared the Defendant would beat her again and decided to leave.

E.Q. testified that she left home in May 2009 because the she was scared all the time and felt she was a prisoner in her home. She said she went to her aunt's house in Arkansas after E.K.Q. moved there. She said that in May 2009 before she moved to Arkansas, the Defendant watched her undress to get into the shower. She said the Defendant grabbed her buttocks and "fiddle[d] . . . down there" every time she bent over. She said that she had to model new bras and panties for the Defendant and that the Defendant felt her breasts to ensure the bra fit.

E.Q. testified that the Defendant asked if he could "pinch" her "p----." When asked if the Defendant attempted to justify his actions as a means of parental control, she said the Defendant stated that he was her father, which made his touching her okay, and that nobody else could touch her in the same manner. She said the Defendant's touching her began in January 2007 when she was in the eighth grade and occurred weekly.

E.Q. testified that the touching occurred over her clothes, that he touched her "so low" on her buttocks that he touched her vagina. She said that the touching made her uncomfortable but that she could not express her feelings because she would have been beaten because "he was dad, it was supposed to be okay." She denied her mother attempted to stop the Defendant and said she became angry at her mother.

E.Q. testified that the Defendant was strict and controlled everything in her life. She agreed she wanted to leave the family home but denied she made up stories about the Defendant's touching her to get out of the house. She said that when the Defendant watched her get out of the shower, she did not attempt to cover herself because the Defendant would "call you out on it" and because it would be "bad" afterward. She said she had to "play along" and hurried to get dressed.

E.Q. testified that she saw the Defendant's touching E.K.Q. and K.Q., who was five years younger. She said her aunt talked to her and told her that the Defendant's actions were not okay and that a way out existed. She said that in May 2009, she asked to live with her aunt, that the Defendant did not want her to leave, that the police were called, that she was taken away, that she reported the Defendant's touching her, and that the Defendant was arrested.

E.Q. testified that the Defendant touched her buttocks and vaginal area over her clothes between January 1, 2007 and January 30, 2007, between February 1, 2007 and February 27, 2007, between March 1, 2007 and March 30, 2007, between April 1, 2007 and

April 29, 2007, between May 1, 2007 and May 30, 2007, between June 1, 2007 and June 29, 2007, between July 1, 2007 and July 30, 2007, between August 1, 2007 and August 30, 2007, between September 1, 2007 and September 29, 2007, between October 1, 2007 and October 30, 2007, between November 1, 2007 and November 29, 2007, between December 1, 2007 and December 30, 2007, between January 1, 2008 and January 30, 2008, between February 1, 2008 and February 27, 2008, between March 1, 2008 and March 30, 2008, between April 1, 2008 and April 29, 2008, between May 1, 2008 and May 30, 2008, between June 1, 2008 and June 29, 2008, between July 1, 2008 and July 30, 2008, between August 1, 2008 and August 30, 2008, between September 1, 2008 and September 29, 2008, between October 1, 2008 and October 30, 2008, between November 1, 2008 and November 29, 2008, between December 1, 2008 and December 30, 2008, between January 1, 2009 and January 30, 2009, between February 1, 2009 and February 27, 2009, between March 1, 2009 and March 30, 2009, between April 1, 2009 and April 29, 2009, and between May 1, 2009 and May 30, 2009. She agreed the Defendant's touching occurred during a two-year and five-month time period. She said she was scared to say anything about the abuse.

On cross-examination, E.Q. testified that she was unhappy and wanted to leave the family home. She agreed the Defendant denied her Internet and telephone access and prohibited her from having a Facebook account and getting piercings. She agreed she spoke to someone at the Carl Perkins Center. When provided her previous statement in which she denied seeing the Defendant touch her sisters, she said she saw the Defendant touch her sisters. She said she called the police after she and her aunt discussed how to get the Defendant out of the house. She denied telling her classmates or her teachers about the abuse.

On redirect examination, E.Q. testified that in her previous statement, she meant that she had never seen the Defendant touch her friends. She said the Defendant touched her and her sisters in front of the immediate family and never hid it. She said the Defendant never touched them when her friends or her sister's friends were at their house. She denied lying about the Defendant's conduct to get him out of the house. She said her aunt had lived previously with the Defendant and knew what she was going through. She said her aunt encouraged her to report the Defendant's conduct and told her that she would protect her. She said her feeling no one would protect her was the reason she did not report his conduct sooner.

Upon this evidence, the Defendant was convicted of thirty-seven counts of sexual battery by an authority figure. He was sentenced to an effective thirty-five-year sentence. This appeal followed.

**I**

The Defendant contends that the State failed to elect properly the conduct for which it sought convictions. He argues the State failed to determine the specific conduct and the specific time during which the conduct occurred, although specific times were established by improper leading questions. The Defendant also contends that the evidence is insufficient to support his convictions because no evidence exists showing specific occurrences or dates of conduct, only generalized statements. The State contends that the election sufficiently identified and distinguished the charged offenses and that the evidence is sufficient to support the Defendant's convictions.

When evidence is presented of multiple offenses that would fit the allegations of the charge, the State must elect the particular offense for which a conviction is sought and the trial court must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. *See, e.g., State v. Brown*, 762 S.W.2d 135, 137 (Tenn. 1998); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997); *State v. Shelton*, 851 S.W.2d 134, 136 (Tenn. 1993); *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973). "The purpose of election is to ensure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask a conviction, then the court cannot be assured of a unanimous decision." *Shelton*, 851 S.W.2d at 138.

> This election requirement serves several purposes. First, it ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense.

*State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000). The most important reason for requiring the election is to protect a defendant against "patchwork verdicts." *Shelton*, 851 S.W.2d at 137.

> The election requirement has been applied almost exclusively in the sex crimes context, and specifically, when the defendant is alleged to have committed a series of sexual acts over a lengthy period of time against young children who are unable to identify the exact date on which any one act was perpetrated.

*State v. Johnson*, 53 S.W.3d 628, 631 (Tenn. 2001) (citing *Brown*, 992 S.W.2d at 389). "[T]he State may introduce evidence of sex crimes allegedly committed against the victim during the time frame charged in the indictment, but, at the close of the proof, the State must elect the facts upon which it is relying for conviction." *Id.* (citation omitted). "[T]he offense must be proven in accordance with the election. . . . If a jury is allowed to convict without specific evidence supporting the election, then the election is superficial and meaningless." *State v. Johnny Lee Hines*, No. 01C01-9709-CC-00405, slip op. at 6 (Tenn. Crim. App. Jan. 27, 1999). "The offense must be proven in accordance with the election, i.e., to have occurred on [the elected] date and under [the] circumstances." *State v. Marvin D. Nance*, No. E2005-01623-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App. Feb. 23, 2007) (citing *Johnny Lee Hines*, slip op. at 6).

The record shows that the prosecutor briefly referred to an election of the offenses during the State's closing argument. The prosecutor told the jury, "We made sure that we were very specific and that we elected one type of offense. The offense that we elected . . . was his fondling their buttocks and their vagina[s]."

Upon this court's own motion, the record was supplemented with a transcript of the trial court's jury instructions regarding the election of the offenses. The record reflects, in relevant part, that the court instructed the jury as follows:

> To insure [sic] a unanimous verdict the law requires the State to elect which alleged act testified to the State and which the State is relying upon for your consideration in deciding whether . . . the defendant is guilty of this offense or any lesser included offense. . . . In this case, the State has elected to submit for your consideration the alleged act of sexual battery by an authority figure and that will be on each of the thirty-seven counts, that these occurred at the defendant's home . . . and then the State was required to go through and make an election on the date.

Regarding E.K.Q., the trial court instructed,

> So in Count One that date would be between January 1, 2007, and January 30, with the allegation that the defendant fondled [E.K.Q.]'s vagina and buttock[.] The difference in Count Two would be the election date. That would be between February 1, 2007, through February 27, 2007[.] With regard to Count Three, the State makes the same election with the difference being the event date, the allegation between March 1, 2007, and March 30, 2007. . . .

The court's jury instruction continued in similar fashion for the remaining counts, noting the only difference as the dates of the offenses.

Regarding E.Q., the trial court instructed,

[T]he State has elected to submit for your consideration the alleged act of sexual battery by an authority figure . . . with the election that the defendant fondled [E.Q.]'s vagina and buttocks. The difference between Count Nine and Thirty-seven on the dates would be Count Nine would be an event date between January 1, 2007, through January 30, 2007. On Count Ten the State makes the same election with regard to facts with the difference between the date being February 1, 2007, through February 27, 2007. On Count Eleven, the State makes the same election with regard to facts with the difference being the allegation occurred March 1, 2007, through March 30, 2007. . . .

The court's instruction continued in similar fashion for the remaining counts, noting the only difference as the dates of the offenses.

We conclude that the State's election of the offenses insufficiently detailed and distinguished the incidents to allow the jury to render discrete and unanimous verdicts on each count of sexual battery by an authority figure and failed to prevent the possibility of a "patchwork verdict." *See Shelton*, 851 S.W.2d at 137; *see also Marvin D. Nance*, slip op. at 7. Regarding E.K.Q., the indictment charged the Defendant with eight counts of sexual battery by an authority figure. Count 1 reads as follows:

COUNT 1: That Jimmy Dale Qualls, on various dates between January 1, 2007 and January 30, 2007, in Hardeman County, Tennessee, and before the finding of this indictment, did unlawfully, feloniously and knowingly engage in unlawful sexual contact with [E.K.Q.], DOB September 1, 1989, a minor at that time, and the Defendant had, at the time of the offense, custodial authority over the victim and used such authority to accomplish the sexual conduct, in violation of T.C.A. §39-13-527, against the peace and dignity of the State of Tennessee.

The remaining seven counts are identical, except for the relevant dates on which the offenses were alleged to have occurred. Count 2 alleged the offense occurred between February 1, 2007 and February 27, 2007, Count 3 alleged between March 1, 2007 and March 20, 2007, Count 4 alleged between April 1, 2007 and April 29, 2007, Count 5 alleged between May 1, 2007 and May 30, 2007, Count 6 alleged between June 1, 2007 and June 29, 2007, Count 7 alleged between July 1, 2007 and July 30, 2007, and Count 8 alleged between August 1, 2007 and August 31, 2007.

At the trial, E.K.Q. testified that she was born on September 1, 1989, that the Defendant was her father, and that she lived at home with her parents until August 2008. In describing the Defendant's sexual touching, she said the Defendant asked to pinch her "p----" frequently and grabbed her vagina when making the statement but "usually made a big joke out of it." She said the Defendant touched her frequently. She said the Defendant grabbed her buttocks when she tried on new bras and panties. She said the Defendant came up behind her and used his finger to "fiddle" with her buttocks and vaginal areas. She said that when she and E.Q. took showers, the Defendant used the bathroom and remained in the bathroom when she attempted to dry off. She said that she attempted to stay covered but that if the Defendant noticed her attempting to stay covered, he would "bust us out" and say, "Why are you trying to keep yourself covered? I'm your dad. It's not like I'm going to look at you or anything?"

E.K.Q. testified that the most frequent abuse she suffered from the Defendant was his grabbing her buttocks and fondling and pinching her vaginal area over her clothes. She said, "it all kind of was altogether" and "done in concert with each other." She denied he touched her beneath her clothes. She said the Defendant asked to pinch her "p----" and fondled her buttocks and vaginal area between January 1, 2007 and January 30, 2007. She said the Defendant did the same between February 1, 2007 and February 27, 2007, between March 1, 2007 and March 30, 2007, between April 1, 2007 and April 29, 2007, between May 1, 2007 and May 30, 2007, between June 1, 2007 and June 29, 2007, between July 1, 2007 and July 30, 2007, and between August 1, 2007 and August 31, 2007. We note that these dates correspond to the eight counts in the indictment regarding E.K.Q. and to the type of touching elected by the State in its closing argument.

Regarding E.Q., the indictment charged the Defendant with twenty-nine counts of sexual battery by an authority figure. Count 9 reads as follows:

COUNT 9: [T]hat . . . on various dates between January 1, 2007 and January 30, 2007, before the finding of this indictment, the said Jimmy Dale Qualls, did unlawfully, feloniously and knowingly engage in unlawful sexual contact with [E.Q.], DOB November 3, 1993, a minor, and the Defendant had, at the time of the offense, custodial authority over the victim and used such authority to accomplish the sexual conduct, in violation of T.C.A. §39-13-527, against the peace and dignity of the State of Tennessee.

The remaining twenty-eight counts are identical, except for the dates on which the offenses were alleged to have occurred. Count 10 alleged the offense occurred between February 1, 2007 and February 27, 2007, Count 11 alleged between March 1, 2007 and March 30, 2007, Count 12 alleged between April 1, 2007 and April 29, 2007, Count 13 alleged between May

1, 2007 and May 30, 2007, Count 14 alleged between June 1, 2007 and June 29, 2007, Count 15 alleged between July 1, 2007 and July 30, 2007, Count 16 alleged between August 1, 2007 and August 30, 2007, Count 17 alleged between September 1, 2007 and September 29, 2007, Count 18 alleged between October 1, 2007 and October 30, 2007, Count 19 alleged between November 1, 2007 and November 30, 2007, Count 20 alleged between December 1, 2007 and December 30, 2007, Count 21 alleged between January 1, 2008 and January 30, 2008, Count 22 alleged between February 1, 2008 and February 27, 2008, Count 23 alleged between March 1, 2008 and March 30, 2008, Count 24 alleged between April 1, 2008 and April 29, 2008, Count 25 alleged between May 1, 2008 and May 30, 2008, Count 26 alleged between June 1, 2008 and June 29, 2008, Count 27 alleged between July 1, 2008 and July 30, 2008, Count 28 alleged between August 1, 2008 and August 30, 2008, Count 29 alleged between September 1, 2008 and September 29, 2008, Count 30 alleged between October 1, 2008 and October 30, 2008, Count 31 alleged between November 1, 2008 and November 29, 2008, Count 32 alleged between December 1, 2008 and December 30, 2008, Count 33 alleged between January 1, 2009 and January 30, 2009, Count 34 alleged between February 1, 2009 and February 27, 2009, Count 35 alleged between March 1, 2009 and March 30, 2009, Count 36 alleged between April 1, 2009 and April 29, 2009, and Count 37 alleged between May 1, 2009 and May 30, 2009.

The record shows that E.Q. was born on November 30, 1993 and that the Defendant was her father. She testified that she lived in the family home until she moved to Arkansas in May 2009. She said that when she lived with the Defendant, he watched her undress to get in the shower. She said the Defendant grabbed her buttocks and "fiddle[d] . . . down there" every time she bent over. She said that she had to model new bras and panties for the Defendant and that the Defendant felt her breasts to ensure a proper fitting. She stated that the Defendant asked if he could pinch her "p----." She said the touching occurred weekly between January 2007 and May 2009. E.Q. stated that the touching occurred over her clothes and that he touched her "so low" on her buttocks that he touched her vagina. She said that the touching made her uncomfortable but that she could not express her feelings because she would have been beaten because "he was dad, it was supposed to be okay." She said that when the Defendant watched her get out of the shower, she did not attempt to cover herself because the Defendant would "call you out on it" and because it would be "bad" afterward. She said she had to "play along" and hurried to get dressed.

E.Q. testified that the Defendant touched her buttocks and vaginal area over her clothes between January 1, 2007 and January 30, 2007, between February 1, 2007 and February 27, 2007, between March 1, 2007 and March 30, 2007, between April 1, 2007 and April 29, 2007, between May 1, 2007 and May 30, 2007, between June 1, 2007 and June 29, 2007, between July 1, 2007 and July 30, 2007, between August 1, 2007 and August 30, 2007, between September 1, 2007 and September 29, 2007, between October 1 2007 and October

30, 2007, between November 1, 2007 and November 1, 2007 and November 29, 2007, between December 1, 2007 and December 30, 2007, between January 1, 2008 and January 30, 2008, between February 1, 2008 and February 27, 2008, between March 1, 2008 and March 30, 2008, between April 1, 2008 and April 29, 2008, between May 1, 2008 and May 30, 2008, between June 1, 2008 and June 29, 2008, between July 1, 2008 and July 30, 2008, between August 1, 2008 and August 30, 2008, between September 1, 2008 and September 29, 2008, between October 1, 2008 and October 30, 2008, between November 1, 2008 and November 29, 2008, between December 1, 2008 and December 30, 2008, between January 1, 2009 and January 30, 2009, between February 1, 2009 and February 27, 2009, between March 1, 2009 and March 30, 2009, between April 1, 2009 and April 29, 2009, and between May 1, 2009 and May 30, 2009. She agreed the Defendant's touching her occurred during a two-year and five-month time period. We note these dates correspond to the twenty-nine counts in the indictment regarding E.Q. and to the type of touching elected by the State as stated in its closing argument.

In *Tidwell v. State*, 922 S.W.2d 497 (Tenn. 1996), each of the fifty-six counts charged the defendant with the commission of a specific offense "on the ___ day of a named month." The offenses spanned fourteen months, and for twelve of those months, the victim was unable to recount any specifics about the offenses. For the remaining two months, the victim testified that the defendant penetrated her at least once a week and that the sexual activity included cunnilingus, fellatio, and vaginal intercourse. *Id.* at 499. The victim was unable to relate a particular act to a specific time by date or other reference, but she described two events with particularity. *Id.* Based on this testimony, our supreme court concluded that there was no "apparent means to differentiate among various counts of the same offense" and that the indictment provided "no means to enable a fact-finder to match a specific conduct to a specific count." *Id.* at 501. The court concluded that the victim's testimony did not distinguish one event in a given month from any other. *Id.* Likewise, the court called this "a grab-bag theory of justice" in which the State could "present proof on as many offenses within the alleged period as it chose." Under this method, "each offense will have been proven beyond a reasonable doubt" and the jury "may reach into the brimming bag of offenses and pull out one for each count." *Id*.

Similar to the present case, in *State v. Brown*, 373 S.W.3d 565 (Tenn. Crim. App. 2011), the defendant was indicted for eighty-five counts of rape of a child, and each count in the indictment alleged the defendant "intentionally, knowingly, and/or recklessly engage[d] in sexual penetration with [the victim], a child less than thirteen years of age." *Id.* at 568. The indictment listed one count for every month between 1995 and 2001 and one count in 2002. *Id.* The victim testified that she stayed overnight with the defendant and her grandmother probably twice a month during the 1995 to 2002 time frame. She said that during her overnight stays and daytime naps, the defendant "always 'did the same thing,'"

-12-

which included the Defendant's putting lotion on his hands, placing his fingers inside her vagina, and putting his mouth "down there." *Id*. On appeal, the State argued that the victim "recounted a single set of facts constituting the crime and testified that the same facts happened every time she visited the [appellant]." The State distinguished *Brown* from *Tidwell* on the ground that the defendant was charged with only rape of a child, as opposed to multiple sex-related offenses. This court stated, though, that *Tidwell* was not based on the fact that multiple types of crimes were alleged and concluded that the victim "could not provide a single detail that differentiated one offense from another" and that failure to require the State to make an election was reversible error. *Id*. at 575.

In the Defendant's previous appeal, this court remanded the case for a new trial because the State failed to make any type of an election of the offenses. Although the State made an election at the retrial as this court instructed, we conclude that the election was inadequate. The victims provided general testimony regarding the Defendant's touching their buttocks and vaginal area during the specified time frames in the indictment but failed to provide particularity in order for the jury to have rendered discrete verdicts for each of the thirty-seven counts. The fact that the testimony was general does not relieve the State of the obligation to make a proper election. *State v. Howard W. Weaver*, No. E2000-00066-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App. Mar. 1, 2001), *perm. app. denied* (Tenn. July 2, 2001); s*ee State v. Clyde Hambrick, Jr.*, No. E1998-00893-CCA-R3-CD, slip op. at 10-12 (Tenn. Crim. App. June 27, 2000) (concluding that the election of the first event of every month was inadequate where the victim failed to describe numerous incidents of sexual abuse with particularity); *State v. Michael Thomason*, No. 02C01-993-CC-00086, slip op. at 18-19 (Tenn. Crim. App. Mar. 7, 2000) (concluding that the absence of an election was reversible error when one of the victims testified the defendant touched her "so many times" but did not describe the incidents with particularity). We note that the trial court's jury instruction did not add any specificity to conduct elected by the State. The State should have elicited from the victims sufficient proof from which a meaningful election could have been made. *See Howard W. Weaver*, slip op. 7 (citing *State v. Brown*, 992 S.W.2d 389, 392-93 (Tenn. 1999) (concluding that the State should have elicited particularizing proof)). Upon remand, the State should elicit sufficient facts from the victims to distinguish each of the alleged offenses and make an election of the offenses based on those facts that will permit a jury to render discrete verdicts for each count.

Regarding the sufficiency of the evidence, our standard of review on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Williams*, 657 S.W.2d 404, 410 (Tenn. 1983). This means that we may not reweigh the evidence but must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences

-13-

from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the "credibility of the witnesses, the weight to be given to their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Dotson*, 254 S.W.3d 378, 395 (Tenn. 2008) (citing *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007)); *see State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

Relative to an election of offense, this court has said,

> [T]he standard for sufficiency of the evidence applies to the designation of offenses as though it were an element of the offenses. Not only must the state's election identify and distinguish offenses sufficiently to allow the trier of fact to render discrete and unanimous verdicts on each, the state must . . . support this election with evidence sufficient for a reasonable trier of fact to find that the offenses occurred as elected beyond a reasonable doubt.

*Johnny Lee Hines*, slip op. at 7.

Sexual battery by an authority figure is defined, in relevant part, as the "unlawful sexual contact with a victim by the defendant" when the victim was "thirteen years of age or older but less than eighteen years of age" and the defendant had "parental or custodial authority over the victim and used the authority to accomplish the sexual contact." T.C.A. § 39-13-527(a)(1), (3)(B) (2010). The record shows that E.K.Q. was born on September 1, 1989, and that the offenses occurred between January 2007 and August 2007. Likewise, E.Q. was born on November 30, 1993, and the offenses occurred between January 2007 and May 2009. Regarding the sexual touching, E.K.Q. testified that the Defendant came up behind her and used his finger to "fiddle" with her buttocks and vaginal area over her clothes. E.Q. testified that the Defendant grabbed her buttocks and "fiddle[d] . . . down there" every time she bent over. E.Q. said the Defendant touched her "so low" on her buttocks that he touched her vagina.

Regarding the Defendant's authority, the record shows that the Defendant was the victims' father and that the victims lived in the family home during the time the offenses were committed. The evidence shows that the Defendant told the victims it was okay for him to touch them because he was their father but not okay for others to touch them. E.K.Q. testified that she always followed the Defendant's instructions because there were consequences for disobedience and that the Defendant kept a "whooping stick" on the gun rack and had choked, punched, and "stomped" her previously. E.Q. testified that the Defendant's touching made her uncomfortable but that she could not express her feelings because she would have been beaten because "he was dad, it was supposed to be okay." She

said that when the Defendant watched her get out of the shower, she did not attempt to cover herself because the Defendant would "call you out on it" and because it would be "bad" afterward. She said she had to "play along" and hurried to get dressed. Although the evidence supports a conclusion that the Defendant engaged in numerous acts of sexual battery by an authority figure, the State's inadequate election requires this court to reverse the convictions and remand the case for a new trial.

In consideration of the foregoing and the record as a whole, we reverse the judgments of the trial court, vacate the convictions, and remand the case for a new trial. We note that the judgments incorrectly state for sentencing purposes that Group D includes indictment Counts 1 through 30.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE