
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
February 3, 2026 Session

## CHRISTOPHER THOMAS THOMPSON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Weakley County**
**No. 2022-CR-82     Jeff Parham, Judge**

_____

### No. W2025-00825-CCA-R3-PC
_____

The Petitioner, Christopher Thomas Thompson, appeals from the Weakley County Circuit Court's denial of his petition for post-conviction relief.  On appeal, the Petitioner argues that he received ineffective assistance of counsel due to trial counsel's failure to develop a defense strategy or otherwise investigate possible defenses and that his guilty plea was involuntary.  Discerning no error, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

STEVEN W. SWORD, J., delivered the opinion of the court, in which KYLE A. HIXSON and MATTHEW J. WILSON, JJ., joined.

Melinda Meador, Martin, Tennessee, for the appellant, Christopher Thomas Thompson.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Colin Johnson, District Attorney General; and Kate M. Bynum, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.     FACTUAL AND PROCEDURAL HISTORY

On May 3, 2022, a Weakley County grand jury returned a seven-count indictment charging the Petitioner and his wife, Jessica Thompson, with various charges relating to the death of the Petitioner's niece, Mandy Noe.  From the record,[1] we glean that on January 21, 2022, while at a camper parked at his address, the Petitioner struck and killed the victim.

_____

[1] Our recitation of the facts giving rise to these charges is complicated by the absence of a transcript of the Petitioner's guilty plea submission hearing from the appellate record.

The Petitioner thereafter rented a tractor, transported it back to his property, dug a grave, and buried the victim's body. The Petitioner was arrested on unrelated charges on February 2, 2022, and the victim's body was exhumed that same day. The Petitioner was subsequently charged with first degree felony murder, aggravated abuse of a vulnerable adult, aggravated neglect of a vulnerable adult, abuse of a corpse, and tampering with or fabricating evidence. The latter four counts of the indictment charged Mrs. Thompson as a codefendant; Mrs. Thompson was also charged with acting as an accessory after the fact and with making a false report. On September 13, 2022, the State filed a notice of its intent to seek a sentence of life imprisonment without the possibility of parole as to the Petitioner.

The trial court appointed the District Public Defender's Office to represent the Petitioner. Through counsel, the Petitioner moved to sever his charges from Mrs. Thompson's charges. Although the record does not include an order granting this motion, the Petitioner's judgments reflect that it was granted.

On October 23, 2023, the Petitioner pled guilty to one count of second degree murder pursuant to a negotiated plea agreement. The remainder of his charges were dismissed by agreement. The trial court imposed a sentence of twenty years' incarceration as a Range I, standard offender at a one hundred percent service rate. Judgments were entered that same day.

On August 21, 2024, the Petitioner filed a timely pro se petition for post-conviction relief. Among other grounds, the Petitioner alleged that his conviction was based upon an unlawfully induced guilty plea and upon a coerced confession. On August 26, 2024, the post-conviction court entered an order finding that the petition presented a colorable claim for post-conviction relief, appointed counsel, and instructed counsel to file an amended petition or notify the post-conviction court that no amendment would be filed within thirty days. The post-conviction court also ordered that the State file an answer within thirty days of the Petitioner's filing an amended petition or notice of no amendment.

On December 11, 2024, the State filed a response in opposition to the petition for post-conviction relief. On February 12, 2025, the Petitioner, through post-conviction counsel, filed an amended petition for post-conviction relief. In his amended petition, the Petitioner maintained that his guilty plea was involuntary and alleged, among other claims, that trial counsel rendered ineffective assistance by failing to adequately advise him about his case or investigate and prepare a defense strategy. On March 7, 2025, the State filed a response in opposition to the Petitioner's amended petition.

The post-conviction court held a hearing on April 8, 2025. Trial counsel testified that he was the elected District Public Defender and had practiced law for twenty-seven years. Trial counsel testified that the District Public Defender's Office was initially

appointed to represent the Petitioner before he took office and that the Petitioner was represented by an Assistant District Public Defender ("first counsel") for approximately eight months following his arrest in February 2022. First counsel left the District Public Defender's Office in October 2022, and trial counsel represented the Petitioner thereafter.

Trial counsel testified that when he began representing the Petitioner, first counsel informed him that the Petitioner "would accept" a twenty-year plea offer. He averred that while the State was not yet at "that point" at the outset of his representation, he eventually negotiated such an offer and presented it to the Petitioner. Trial counsel testified that the Petitioner rejected this offer and "wanted to go lower than that," seeking a ten- or fifteen-year sentence instead. Trial counsel stated that he unsuccessfully attempted to negotiate with the State in accordance with the Petitioner's wishes.

Trial counsel testified that he reviewed the Petitioner's preliminary hearing, visited the crime scene, and retained two investigators to help him prepare the Petitioner's defense. He stated that the investigators reviewed discovery, met with the Petitioner, "developed a case strategy with the defense team," and located, interviewed, and took statements from witnesses. The investigators also prepared a report of their findings.

Trial counsel recalled that the Petitioner requested that he speak with his son and investigate a "pellet pistol." Trial counsel testified that he interviewed the Petitioner's son, who did not "have a whole lot to say" regarding the Petitioner's case. However, he noted that the Petitioner's son informed him of certain potential marital problems between the Petitioner and Mrs. Thompson. Trial counsel further recalled that first counsel took photographs of the "pellet pistol" when he visited the crime scene. Trial counsel averred that he unsuccessfully attempted to locate the pistol when he began representing the Petitioner; however, nearly a year had elapsed since the offenses by that time, and the Petitioner's home had since been "ransacked." He testified that he believed the pistol was relevant because the victim sustained several "pellet gun injuries" to her buttocks and to the backs of her legs and knees. Trial counsel stated that he and the Petitioner discussed this evidence. He also recalled that, on the morning after the victim's murder, the victim's father and Mrs. Thompson drove to Georgia to visit one of Mrs. Thompson's relatives. Trial counsel described this as "highly coincidental" and recalled discussing it as a potential defense theory with the Petitioner, noting that the Petitioner "could have run" but instead remained to bury the victim's body.

Trial counsel testified that he wrote at least five or six letters to the Petitioner throughout the course of his representation in which he discussed the evidence in the Petitioner's case and discussed its potential strengths and weaknesses if the Petitioner elected to go to trial. He stated that the Petitioner confessed during an interview with officers from the Weakley County Sheriff's Office (WCSO). He averred that he did not

file a motion to suppress the Petitioner's statements because he did not believe one would be meritorious. He also opined that there was "ample other evidence" which he believed would have incriminated the Petitioner at trial.

Trial counsel stated that the State agreed to extend the Petitioner's plea deadline to October 23, 2023, and that the State informed him it would not be extended further. Trial counsel stated that he met with the Petitioner several times prior to the plea deadline and that the Petitioner continuously refused the State's twenty-year plea offer, maintaining he "want[ed] lower than [twenty] years." Trial counsel again unsuccessfully attempted to negotiate with the State for a new plea offer. On October 23, 2023, the Petitioner was scheduled to appear in court for a status hearing, and trial counsel met with him beforehand. Trial counsel stated that Jeffery Washburn, an Assistant District Public Defender, accompanied him at this meeting as a witness. Trial counsel recalled that the Petitioner again rejected the State's twenty-year plea offer. However, after several minutes of silence, the Petitioner reinitiated conversation and informed trial counsel he would accept the State's plea offer. Trial counsel and the Petitioner discussed the plea offer, and the Petitioner subsequently pled guilty.

Trial counsel denied that he pressured or coerced the Petitioner into pleading guilty and stated that the Petitioner did not appear confused about the consequences of his pleading guilty. He also averred that he was prepared to go to trial if the Petitioner decided against pleading guilty, although he noted that the Petitioner's trial "would have been set months after" the plea deadline. He recalled that he had a trial notebook "made up" and that he had reviewed discovery and discussed it with the Petitioner.

On cross-examination, trial counsel agreed that he wrote the Petitioner a letter on October 12, 2023, in which he discussed the Petitioner's "options before [his] plea deadline." He also agreed that the letter discussed the strengths of the State's evidence, explained why the Petitioner "d[id] not have a good case," and did not discuss any "potential defense." Trial counsel testified that the Defendant did not "have much of a defense"; however, he noted that the Petitioner informed him he had broken up a fight between the victim and Mrs. Thompson shortly before the victim's death.

The October 12, 2023 letter was admitted as an exhibit through trial counsel's testimony. In the letter, trial counsel discussed the Petitioner's statements to the investigating officers, noting that the Petitioner informed the officers that he had pushed the victim backward and caused the victim to hit her head. The Petitioner also informed the officers that the victim's body was "on the property" and would not be "hard to find." Trial counsel also discussed Mrs. Thompson's statement to the investigating officers. He noted that while Mrs. Thompson initially stated the Petitioner had "beat" the victim, she later stated that the Petitioner pushed the victim and caused her to fall and hit her head.

Trial counsel also discussed a conference call he had with a retained investigator and a medical examiner. He stated that the Petitioner had seen photographs of the victim's body taken after her body was exhumed, which depicted her injuries. He noted that the victim's injuries showed that she suffered "multiple blows administered with great force" and that she had been "beaten to death." Trial counsel contrasted this with the Petitioner's statement that he pushed the victim. Trial counsel also noted that the victim suffered six "pellet gun injuries" to her thighs and lower back. He averred that there was "no way to determine which person did this damage to her body."

In his letter, trial counsel requested additional information regarding any of the Petitioner's prior convictions. He stated that if the Petitioner was convicted of first degree murder following a jury trial, he faced a life sentence without the possibility of parole. He noted that if the Petitioner was convicted of second degree murder and had no prior felony convictions, he could receive a sentence between fifteen and twenty-five years' incarceration without the possibility of parole. He informed the Petitioner that if the Petitioner had one prior qualifying felony conviction, he could receive a sentence of up to twenty-five years' incarceration, and if the Petitioner had two or more prior qualifying felony convictions, he could receive a sentence between twenty-five and forty years' incarceration. Trial counsel similarly advised the Petitioner of his sentencing exposure if he was convicted as charged of aggravated abuse of a vulnerable adult, noting that if the Petitioner had a sufficient number of prior qualifying felony convictions, he could receive a sentence of up to thirty years' incarceration. Trial counsel also noted that the trial court could align the Petitioner's convictions consecutively.

Trial counsel concluded his October 12, 2023 letter by reiterating that the State's twenty-year plea offer would not be lowered. He wrote that the Petitioner had "a right to a trial by jury" and that the "choice" was his to make. He also reminded the Petitioner that the deadline to accept the State's twenty-year plea offer was October 23, 2023, and that the trial court would only accept a blind plea thereafter.

Trial counsel testified that he met with the Petitioner on October 16, 2023, and that he took notes during this meeting. Relying upon his notes, trial counsel recalled that the Petitioner confirmed that he had received and read trial counsel's October 12, 2023 letter. The Petitioner again rejected the State's twenty-year plea offer, stating "[I]f I do [twenty] years, I'[ll] be dead in two weeks. I'll never survive it. It doesn't matter if I get life without parole or the death penalty." The Petitioner further informed trial counsel that he believed that an investigating officer had mischaracterized his statement to the police during that officer's testimony at the Petitioner's preliminary hearing. The Petitioner requested that trial counsel provide him with photographs of the pellet gun and of the fuse box, which first counsel took during first counsel's visit to the crime scene. The Petitioner asserted that he believed these photographs would prove the investigators had neglected to test

- 5 -

certain evidence and that the fuse box had been moved from its initial position. Trial counsel responded that he had previously provided these photographs to the Petitioner and that he would send them again, along with the pattern jury instructions for charges of first degree murder and felony murder. Trial counsel testified that on October 19, 2023, he spoke with the prosecutor, who informed him the State would withdraw its twenty-year plea offer if the Petitioner "continue[d] to reject it."

Trial counsel testified that he met with the Petitioner twice on October 20, 2023. During the first meeting, the Petitioner stated he would agree to a fifteen-year plea offer and again rejected the State's twenty-year plea offer. He rejected the idea of entering a blind plea. After the first meeting, trial counsel again spoke with the prosecutor and attempted to negotiate a fifteen-year plea offer. The prosecutor refused and stated that he would like to schedule a status hearing on October 23, 2023, the same day as the Petitioner's plea deadline, so he could ensure the Petitioner "understood the ramifications of this passing plea deadline." During the second meeting, trial counsel again discussed the State's twenty-year plea offer with the Petitioner and reviewed photographs of the victim with the Petitioner. Trial counsel recalled that the photographs depicted certain of the victim's injuries, which the Petitioner opined "could have been from where she was buried." The Petitioner denied killing the victim, but he admitted that he buried her. The Petitioner again rejected the State's twenty-year plea offer and maintained that he wanted to go to trial. Trial counsel recalled that their meeting concluded with a discussion of the clothing the Petitioner might wear at trial.

Trial counsel testified that he met with the Petitioner on October 23, 2023, prior to the Petitioner's status hearing. He stated that he again discussed the State's twenty-year plea offer with the Petitioner during this meeting and that Mr. Washburn sat in on the meeting as a witness. Trial counsel recalled that during the meeting, first counsel "came by" and showed the Petitioner several photographs on his cell phone, which the Petitioner stated he had previously seen. Trial counsel again discussed the State's twenty-year plea offer with the Petitioner, and the Petitioner again rejected it, maintaining that he was innocent.

Trial counsel testified that he sat next to the Petitioner and "didn't say a word for a while" after the Petitioner's final rejection of the State's twenty-year plea offer. He recalled that the Petitioner then began "re-exploring the idea of a plea." After a discussion, the Petitioner stated he would accept the State's twenty-year plea offer.

Trial counsel estimated that ten minutes elapsed between the Petitioner's acceptance of the State's twenty-year plea offer and his pleading guilty. He stated that he stood beside the Petitioner while the Petitioner pled guilty and that he did not question the Petitioner during the guilty plea submission hearing regarding the Petitioner's decision. He stated

that the trial court asked its "standard questions" during the guilty plea submission hearing. Trial counsel agreed that the trial court was not informed that the Petitioner had previously maintained his innocence.

On redirect examination, trial counsel testified that he discussed the strengths and weaknesses of the Petitioner's potential defenses with the Petitioner multiple times before the Petitioner pled guilty. He averred that he "practically never" questioned a defendant during a guilty plea submission hearing. He also testified that he had no concerns that the Petitioner's plea was involuntary because the terms of the negotiated plea agreement reflected "what [the Petitioner] wanted to do back when [trial counsel] first took the case."

First counsel testified that he represented the Petitioner while he worked as an Assistant District Public Defender. He recalled that he was assigned the Petitioner's case shortly after the Petitioner informed investigating officers that the victim's body was located on his property. First counsel testified that he was asked to serve as an "intermediary" between the Petitioner and law enforcement when the investigating officers were unable to locate the victim's body on the Petitioner's property. First counsel did not recall whether the Petitioner confessed to killing the victim. He noted that the Petitioner informed him that the victim and Mrs. Thompson had argued shortly before the victim's murder, but he was unsure whether the Petitioner also provided this information to the investigating officers.

First counsel testified that he visited the crime scene along with the investigating officers and photographed a blood spatter on a wall and a metal box. First counsel denied seeing any blood on the metal box and averred that he did not request that the box be tested. First counsel later interviewed witnesses, including the victim's father, employees from First Choice Rentals, where he stated the Petitioner rented the tractor he used to bury the victim's body, and Mrs. Thompson's relative, whom she and the victim's father visited the day after the victim's murder.

First counsel stated he left the District Public Defender's Office in October 2022 and joined the District Attorney General's Office. He testified that while he was in court on October 23, 2023, trial counsel approached him and asked if he still had the photographs he had taken of the crime scene. First counsel stated that he did, and he agreed to allow the Petitioner to review the photographs. He stated that he did not discuss the Petitioner's case with him during this interaction.

Jeffery Washburn testified that he worked as a part-time Assistant District Public Defender. Mr. Washburn stated that while he was in court on October 23, 2023, trial counsel approached him and asked if he would "walk down to the end of the hall with him and the client that he was representing." Mr. Washburn agreed. Mr. Washburn recalled

observing a conversation in which trial counsel informed the Petitioner that the State would withdraw its twenty-year plea offer that day if the Petitioner refused it and asked the Petitioner to consider the offer. Mr. Washburn described the Petitioner as initially uninterested in the State's twenty-year plea offer; he did not recall the Petitioner's disposition towards the offer after he was informed it would be withdrawn that day. Mr. Washburn testified that he had no prior or subsequent involvement in the Petitioner's case.

The Petitioner testified that although he did not want to "take the plea deal to begin with," he pled guilty on October 23, 2023. He averred that trial counsel told him he "need[ed] to take this plea deal" and "forc[ed] it" upon him. He did not recall that the State's twenty-year plea offer would have been withdrawn if he had not accepted it that day, but he stated that this would not have influenced his decision, maintaining that he was prepared to go to trial. He testified that he was innocent and stated that he had never told anyone he was guilty of murdering the victim.

He recalled that he asked the District Public Defender's Office to examine the pellet gun and test it for fingerprints because he believed "that could have been a big issue." He also stated that he had never seen any reports analyzing the victim's blood spatter, the fuse box, or any "supposed weapon." He averred that trial counsel did not show him any statements from the witnesses in his case.

The Petitioner testified that he received only one letter from trial counsel, which he described as a "brief statement" regarding his next court date. He recalled meeting with trial counsel on October 16, 2023, and informing him that he did not want to accept the State's twenty-year plea offer. He stated that first counsel had known he did not want to plead guilty. He testified that he once stated, "If you're going to force me to take a plea deal, they can at least give me [fifteen] years with a less [sic] percentage." He described this statement as sarcastic.

On cross-examination, the Petitioner did not recall whether he testified he was satisfied with trial counsel's performance during his guilty plea submission hearing; however, he asserted that he did not inform the trial court he was dissatisfied with trial counsel's performance because he was at "a point of just giving up." The Petitioner agreed that trial counsel's duty was to advise him of the potential strengths and weaknesses in his case. He averred that trial counsel "pushed" him to accept the State's twenty-year plea deal throughout the course of his representation. Although he testified that trial counsel did not investigate certain issues he requested, or review evidence with him, he conceded that trial counsel showed him photographs of the crime scene and provided him with two copies of discovery materials. However, he maintained that the discovery materials he was provided were incomplete. On redirect examination, the Petitioner testified that trial counsel did not discuss or suggest any trial strategies or defenses with him.

Following this proof and the parties' arguments, the post-conviction court took the matter under advisement. On May 6, 2025, the post-conviction court entered an order denying post-conviction relief, finding the Petitioner had failed to establish either that he received the ineffective assistance of counsel or that his guilty plea was involuntary. This timely appeal followed.

## II. ANALYSIS

On appeal, the Petitioner argues that he received ineffective assistance of counsel and that his guilty plea was involuntary. The State responds that the post-conviction court properly denied relief. We agree with the State.

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

The Petitioner first argues that he received ineffective assistance of counsel due to trial counsel's failure to develop a defense strategy or otherwise investigate possible defenses. He asserts that trial counsel merely conducted a "superficial investigation" and failed to develop any strategy for the Defendant's trial. He contends that despite trial counsel's testimony that the Defendant did not "have much of a defense," there were at least two "obvious" potential defenses which trial counsel deficiently failed to explore. The State responds that the Petitioner has failed to establish any deficiency.

The Post-Conviction Procedure Act provides relief only when a petitioner's "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. In a post-conviction proceeding, a petitioner has the burden of proving his allegations by clear and convincing evidence. *Id.*; Tenn. S. Ct. R. 28, § 8(D)(1). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). The standard of review on appeal dictates that the post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against them, *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015) (citations omitted), while its application of the law to those factual findings and the conclusions drawn therefrom are reviewed *de novo* with no presumption of correctness, *Holland v. State*, 610 S.W.3d 450, 455 (Tenn. 2020) (citations omitted).

Both the Constitution of the United States and the Constitution of Tennessee provide the criminal defendant the right to the effective assistance of counsel. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the

Assistance of Counsel for his defence."); Tenn. Const. art. 1, § 9 ("That in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel"); *see Davidson v. State*, 453 S.W.3d 386, 392-93 (Tenn. 2014). To succeed on a claim of ineffective assistance of counsel, the post-conviction petitioner must prove, and the record must affirmatively establish, both that counsel performed deficiently and that this deficient performance adversely impacted the petitioner's defense. *Strickland v. Washington*, 466 U.S. 668, 693 (1984); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). "A court need not address both prongs if the petitioner fails to demonstrate either one of them." *Davidson*, 453 S.W.3d at 393. Each element of the *Strickland* analysis of an ineffective assistance of counsel claim is a mixed question of law and fact that this court reviews *de novo*. *Phillips v. State*, 647 S.W.3d 389, 400 (Tenn. 2022) (citing *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009)); *Kendrick*, 454 S.W.3d at 457.

Deficient performance is that which, in consideration of "all the circumstances" and the prevailing professional norms at the time of counsel's representation, falls below an objective standard of reasonableness. *Phillips*, 647 S.W.3d at 400 (quoting *Strickland*, 466 U.S. at 688). We defer to counsel's strategic and tactical decisions, even if such decisions were unsuccessful or harmful to the defense, so long as they were "informed ones based upon adequate preparation." *Moore v. State*, 485 S.W.3d 411, 419 (Tenn. 2016) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). In other words, so long as counsel's decisions are made after adequate preparation, this court "will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings." *Berry v. State*, 366 S.W.3d 160, 172-73 (Tenn. Crim. App. 2011). Thus, a petitioner who alleges ineffective assistance of counsel must, through clear and convincing evidence, overcome the strong presumption "that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (citation omitted).

The post-conviction petitioner must also prove that counsel's deficient performance affected the outcome of his or her trial; that is, there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is that which is "sufficient to undermine confidence in the outcome" of the trial. *Id*. Accordingly, "a petitioner must establish that 'counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome.'" *Mobley v. State*, 397 S.W.3d 70, 81 (Tenn. 2013) (quoting *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008)). When a petitioner claims ineffective assistance of counsel in a case which resulted in a guilty plea, as here, the petitioner "must show a reasonable probability that, but for trial counsel's deficient performance, 'he would not have pled guilty and would have insisted on going to trial.'" *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009) (citing *Hill*, 474 U.S. at 59).

Thus, the focus of the prejudice requirement in a guilty-pled case is whether the deficiency in performance "affected the outcome of the plea process." *Hill*, 474 U.S. at 59.

The post-conviction court found that the Petitioner failed to establish either the deficient performance prong or the prejudice prong of the *Strickland* test. In its order denying post-conviction relief, the post-conviction court relied upon trial counsel's testimony that he met with the Petitioner approximately ten times, hired a private investigator to review discovery and interview witnesses, discussed discovery with the Petitioner, and explained the medical examiner's findings to the Petitioner. The record does not preponderate against the post-conviction court's findings of fact. Trial counsel testified that he reviewed first counsel's work on the Petitioner's case when he began representing him. Although trial counsel did not believe there were strong defenses in the Petitioner's case, he nevertheless interviewed the Petitioner's son and investigated the pellet gun upon the Petitioner's request. Trial counsel also testified that he had prepared a notebook and was ready to go to trial, despite the fact that the Petitioner's trial "would have been set months after" the plea deadline. Therefore, we agree with the post-conviction court's findings that the Petitioner failed to establish deficient performance regarding trial counsel's investigation and trial preparation.

The Petitioner further claims that trial counsel performed deficiently because he failed to identify and investigate two "obvious" potential defense theories—namely, arguing that the proof was sufficient to convict the Petitioner of manslaughter rather than first degree murder and attempting to shift the blame for the victim's death onto other individuals also present during the murder. Instead, the Petitioner characterizes trial counsel's strategy as simply attempting to convince the Petitioner to accept the State's twenty-year plea offer. These claims are unavailing for three reasons.

Firstly, and as noted above, we begin our analysis with the presumption that trial counsel's actions are the product of sound trial strategy, a presumption which a post-conviction petitioner bears the burden of rebutting by clear and convincing evidence. *Strickland*, 466 U.S. at 689; *Kendrick*, 454 S.W.3d at 458. Importantly, we do not provide petitioners with the benefit of twenty-twenty hindsight by second-guessing decisions made after adequate preparation. *Berry*, 366 S.W.3d at 172-73. The Petitioner did not ask trial counsel during the post-conviction evidentiary hearing whether he had considered these "obvious" potential defense strategies. Although the Petitioner contends that he did not need to ask such questions because trial counsel testified he did not believe the Petitioner had "much of a defense," it is entirely plausible that trial counsel considered these strategies and rejected them following his investigation. Without any testimony to this effect, and in consideration of the high burden of proof upon post-conviction petitioners to establish deficient performance, we decline to speculate as to whether trial counsel truly "failed" to investigate these potential defense strategies or how he would have testified if asked about

them. Moreover, contrary to the Petitioner's claim that trial counsel neglected to develop any defense theory, trial counsel testified that he discussed the victim's father and Mrs. Thompson's driving to Georgia to visit one of Mrs. Thompson's relatives the morning after the victim's murder while the Petitioner remained at home to bury the victim's body as a potential defense theory with the Petitioner.

Secondly, a review of trial counsel's October 12, 2023 letter belies the Petitioner's claims. In his letter, trial counsel reviewed the Petitioner's statement to the police, noting that he informed the investigating officers that the victim's body was "on the property" and would not be "hard to find"; contrasted the Petitioner's statement with Mrs. Thompson's initial statement to the police; and summarized his discussion with a retained investigator and a medical examiner. In the latter summary, trial counsel detailed the victim's injuries and opined that there was "no way to determine which person did this damage to her body." In short, trial counsel advised the Petitioner regarding the strengths and weaknesses of the Petitioner's case, as was his duty.

Additionally, although the Petitioner characterizes the letter's tone as "hostile" and exaggerative of the Petitioner's potential sentences, trial counsel's advice was accurate. Trial counsel advised the Petitioner he could receive a sentence of life without the possibility of parole if convicted of first degree murder as charged, as the State filed a notice of its intent to seek such a sentence on September 13, 2022. Trial counsel also accurately advised the Petitioner that he could receive sentences between fifteen and forty years' incarceration if convicted of the lesser-included offense of second-degree murder, depending upon the number of his prior qualifying felony convictions. Second degree murder is a Class A felony for which a trial court may impose a sentence between fifteen and twenty-five years' incarceration for Range I, standard offenders, and between twenty-five and forty years' incarceration for Range II, multiple offenders. Tenn. Code Ann. §§ 39-13-210(c)(1); 40-35-112(a)(1), (b)(1).[2] Trial counsel similarly advised the Petitioner regarding his charge of aggravated abuse of a vulnerable adult, counseling that the Petitioner could receive a sentence of up to thirty years' incarceration if convicted. Aggravated abuse of a vulnerable adult, as charged in this case, is a Class B felony for which a trial court may impose a sentence of up to thirty years' incarceration for Range III offenders. *Id.* §§ 39-15-511(c); 40-35-112(c)(2). The record supports the post-conviction court's conclusion that trial counsel did not perform deficiently.

Finally, and crucially, the Petitioner has failed to establish or allege that, but for any of trial counsel's alleged deficiencies, he would not have accepted the State's twenty-year plea offer and not pled guilty, so he has not established that he was prejudiced by trial

---

[2] Trial counsel did not advise the Petitioner of his potential sentencing exposure for this charge if he was convicted and classified as a Range III offender.

counsel's actions. *Hill*, 474 U.S. at 59; *Grindstaff*, 297 S.W.3d at 221. The Petitioner is not entitled to relief.

## B. Involuntary Guilty Plea

The Petitioner also argues that the post-conviction court erred by concluding his guilty plea was voluntary. He asserts that he maintained his innocence up until the moment he pled guilty and that the trial court should have been informed of his sudden "change of heart." He also contends that trial counsel "forc[ed]" him to enter a guilty plea and, accordingly, that his guilty plea was the product of coercion. The State responds that the Petitioner has waived appellate review of this claim by failing to include a copy of the transcript of his guilty plea submission hearing in the appellate record.

The Due Process Clause of the United States Constitution requires that a guilty plea be entered knowingly, voluntarily, and intelligently. *Boykin v. Alabama*, 395 U.S. 238, 243 n.5 (1969); *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010). "A guilty plea is knowingly, voluntarily, and intelligently entered if it represents 'a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Davis v. State*, No. M2024-01238-CCA-R3-PC, 2025 WL 2453101, at *11 (Tenn. Crim. App. Aug. 26, 2025) (quoting *Jaco v. State*, 120 S.W.3d 828, 831 (Tenn. 2003)), *no perm. app. filed*. A trial court must consider the totality of the circumstances in determining if a plea has been entered knowingly, voluntarily, and intelligently. *Blankenship v. State*, 858 S.W.2d 897, 905 (Tenn. 1993). A "formidable barrier in any subsequent collateral proceedings" is created by a defendant's declarations in open court because such declarations "carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *Davis*, 2025 WL 2453101, at *11.

As the State notes, the Petitioner failed to include a transcript of his guilty plea submission hearing in the appellate record. On appeal, the appellant bears the burden of compiling, preparing, and submitting a record adequate for review, such as is "necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). This burden includes the obligation to submit a transcript of any proceeding that is the subject of the appellant's assignment of error or, if no transcript is available, a statement of the evidence. Tenn. R. App. P. 24(b), (c); *see also State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." *State v. Brown*, 373 S.W.3d 565, 571 (Tenn. Crim. App. 2011) (quoting *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991)) (internal quotation marks omitted).

In his reply brief, the Petitioner asserts that a review of his guilty plea submission hearing transcript is unnecessary to adjudicate the merits of his claim because his argument is rooted in counsel's ineffective assistance rather than a claim of any deficiency in the trial court's plea colloquy. To be sure, a petitioner may seek post-conviction relief on the basis of an involuntarily entered guilty plea either as a claim of ineffective assistance of counsel or as a standalone argument of constitutional deficiency. *See* Tenn. Code Ann. § 40-30-103 ("Relief under [the Post-Conviction Procedure Act] shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States."); *see also Mendoza v. State*, No. M2001-01855-CCA-R3-PC, 2003 WL 1610824, at *14 (Tenn. Crim. App. Mar. 28, 2003) ("Independent of, and as an alternative to, the claim of ineffective assistance of counsel, a post-conviction petitioner may successfully attack his conviction when his guilty plea was unknowing or involuntary."), *perm. app. denied* (Tenn. Sept. 2, 2003). The considerations are subtly different for the two claims. A petitioner asserting his or her guilty plea was involuntarily entered as a result of the ineffective assistance of counsel must show that, but for counsel's deficient performance regarding the entry of the plea, the petitioner would not have pled guilty and would have instead insisted upon going to trial. *Calvert v. State*, 342 S.W.3d 477, 486 (Tenn. 2011) (citing *Hill*, 474 U.S. at 59). In the context of a standalone constitutional claim, a petitioner must establish, based upon the totality of the circumstances, that his or her guilty plea was not the product of "a voluntary and intelligent choice among the alternative courses of action" available to the petitioner. *Jaco*, 120 S.W.3d at 831. However, in either case, the appellant's burden of preparing an adequate record remains the same, and in the absence of an adequate record, we must presume the lower court ruled correctly. *Brown*, 373 S.W.3d at 571.

Here, a review of the guilty plea submission hearing transcript is a necessary prerequisite to our ability to conduct a meaningful appellate review of the Petitioner's claim. As noted above, a defendant's statements during a guilty plea submission hearing pose formidable barriers in subsequent collateral attack proceedings. *Blackledge*, 431 U.S. at 74; *Davis*, 2025 WL 2453101, at *11. The Petitioner's claims are based, in part, upon trial counsel's perceived inadequacies during the plea colloquy; he asserts that trial counsel should have questioned the Petitioner regarding his change of heart but failed to do so. Additionally, as the post-conviction court noted in its order denying relief, it "took the Petitioner's guilty plea and found upon questioning that the plea was voluntarily, knowingly, and freely given." The questions asked, and the Petitioner's responses thereto, are, accordingly, necessary to our review of the Petitioner's claims that his plea was involuntary, and the transcript of the guilty plea submission hearing is directly relevant to our review of the Petitioner's claim. In its absence, we must presume the post-conviction court ruled correctly. *See Fifer v. State*, No. W2024-01377-CCA-R3-PC, 2025 WL 1753576, at *6 (Tenn. Crim. App. June 25, 2025) (concluding that meaningful appellate review of the petitioner's claims regarding her guilty plea based upon counsel's alleged

- 14 -

ineffective assistance and the plea's constitutional validity was impossible because of the omission of a transcript of the guilty plea submission hearing), *perm. app. denied* (Tenn. Nov. 20, 2025).

From the limited record we do have, trial counsel testified that he did not pressure or coerce the Petitioner into pleading guilty and that he did not believe the Petitioner's plea was involuntary because the terms of the negotiated plea agreement reflected "what [the Petitioner] wanted to do back when [trial counsel] took the case." The post-conviction court implicitly accredited this testimony over the Petitioner's contrary testimony in its order denying post-conviction relief, and nothing in the appellate record preponderates against that determination. The Petitioner is not entitled to relief.

### III.   CONCLUSION

Following our review of the record and based upon the foregoing analysis, we affirm the judgment of the post-conviction court.

s/ *Steven W. Sword*

STEVEN W. SWORD, JUDGE